ORIGINAL

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2014 NOV 24   PM 4:00

CLERK OF COURT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| DIGITAL RECOGNITION NETWORK, INC., | ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) |
| | ) Civil Action No. 4:14-CV-00903-A |
| ACCURATE ADJUSTMENTS, INC.; COASTLINE RECOVERY SERVICES, INC.; AFTER HOURS AUTO RECOVERY; and SOLID SOLUTIONS 24/7, INC., | ) ) ) ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S AMENDED COMPLAINT

Plaintiff Digital Recognition Network, Inc. ("Plaintiff" or "DRN"), a Delaware corporation, files this Amended Complaint complaining of Defendants Accurate Adjustments, Inc. ("Accurate"), Coastline Recovery Services, Inc. ("Coastline"), After Hours Auto Recovery ("After Hours"), and Solid Solutions 24/7, Inc. ("Solid") (collectively, the "Defendants"), and in support thereof respectfully states:

### I.   PARTIES

1.    Plaintiff DRN is a Delaware corporation doing business within the state of Texas, with its principal place of business at 4150 International Plaza, Suite 800, Fort Worth, Texas 76109.

2.    Defendant Accurate Adjustments, Inc. is a former Licensee of DRN. Accurate is a California corporation with its principal place of business in California. Accurate's counsel in this case, Sara Siegall, has agreed to accept service on behalf of Accurate.

3.     Defendant Coastline Recovery Services, Inc. is a former Licensee of DRN. Coastline is a California corporation with its principal place of business in California. Coastline's counsel in this case, Sara Siegall, has agreed to accept service on behalf of Coastline.

4.     Defendant After Hours Auto Recovery is a former Licensee of DRN. After Hours is a California corporation with its principal place of business in California. After Hours was served with process on or about November 12, 2014.

5.     Defendant Solid Solutions 24/7, Inc. is a former Licensee of DRN. Solid is a California corporation with its principal place of business in California. Solid was served with process on or about November 10, 2014.

6.     On information and belief, one or more of Defendants herein are participating in a conspiracy with other individuals and/or companies to misappropriate Plaintiff's trade secrets, and engage in other significant misconduct. Upon further development of these facts through discovery, Plaintiff intends to join and serve such additional parties, together with any other third persons involved in such conduct and conspiracies, and pursue all available claims, remedies and relief against such persons.

## II.   JURISDICTION

7.     Jurisdiction is proper in this Court pursuant to 28 USC §1332(a)(1) based on diversity of citizenship. DRN is a citizen of the States of Delaware and Texas in that it is organized under the laws of the State of Delaware and has its principal place of business in the State of Texas. Accurate is a citizen of the State of California in that it is organized under the laws of the State of California and has its principal place of business in the State of California. Coastline is a citizen of the State of California in that it is organized under the laws of the State of California and has its principal place of business in the State of California. After Hours is a citizen of the State of California in that it is organized under the laws of the State of California

and has its principal place of business in the State of California.  Solid is a citizen of the State of

California in that it is organized under the laws of the State of California and has its principal

place of business in the State of California.  The amount in controversy in this case, exclusive of

interest and costs, exceeds $75,000.00.

### III.   VENUE

8.    Venue is proper in this judicial district under 28 U.S.C. §1391(b)(2) because a

substantial part of the events or omissions giving rise to the claim occurred, or a substantial part

of property that is the subject of the action is situated, in this judicial district.  In addition, this

cause arises out of each Defendant's breach of a license agreement by and between Plaintiff and

each Defendant (each a "License Agreement" and collectively the "License Agreements").  The

License Agreements each contain a provision (i) providing for exclusive jurisdiction as to any

dispute broadly arising out of such Agreement to be in either state or federal court in Tarrant

County, Texas and (ii) waiving any objection to venue or to convenience of forum.  Each

Defendant contractually submitted to the personal jurisdiction of such court for any License

Agreement-related lawsuit.  Some, but not all, of DRN's claims herein arise out of the License

Agreements.

### IV.   FACTUAL BACKGROUND

9.    This lawsuit concerns Defendants' deliberate violation of their contractual

noncompetition and other legal obligations to DRN.  In willful and flagrant disregard of their

obligations under License Agreements entered into with DRN, and applicable law, Defendants

are directly or indirectly participating and engaging in the business of using License Plate

Recognition data and technology for the purpose of recovering and repossessing vehicles for

financial and lending customers.  Defendants are also violating their contractual and other legal

obligations to DRN by continuing to use DRN's trade secrets and highly confidential and

proprietary business information in the form of DRN's Car Detector software and DSP software, for Defendants' own financial benefit.

## A.   PLAINTIFF'S ROLE IN THE AUTO FINANCE INDUSTRY

10.   Plaintiff DRN is a majority owned subsidiary of Vigilant Solutions, Inc. ("Vigilant"). Vigilant develops technology that analyzes photographs and looks for specific content that might be contained within a photograph. At the most basic level, image-content analysis is the extraction of meaningful information from a photograph, and it can be achieved by either a human or by a machine such as a digital camera, mobile phone, computer, processor, or electrical circuit. Vigilant and DRN executives have developed and integrated image-content analysis techniques into various markets, including techniques for optical character recognition, pattern recognition, and motion detection.

11.   The subject of this suit is a technique and process developed by Vigilant involving the use of Optical Character Recognition ("OCR") to interpret alphanumeric characters, depicted within a photograph of a license plate, into machine-readable text. In one of its applications of this image-content analysis, Vigilant utilizes a Digital Signal Processor ("DSP") to convert analog camera output (a photograph) into a digital photograph, which can then be analyzed by DSP algorithms to determine if the image contains a pattern that could be representative of a rectangle containing alphanumeric characters (*i.e.,* a possible license plate). Because Vigilant and others use such techniques in an effort to locate specific content within a photograph—namely, the alphanumeric content printed on a license plate—the application of this technology that is at issue here has sometimes been referred to as "automatic license plate reader" or "ALPR" systems or technology.

12.   DRN has integrated ALPR systems, developed by Vigilant, into highly specialized and proprietary software applications to serve the automobile finance, automobile

insurance, and vehicle repossession industries.  DRN sells cameras, and licenses its proprietary software, the combination of which creates systems that are typically mounted on tow trucks or vehicles owned by repossession company licensees such as Defendants, which automatically photograph every license plate the camera-equipped vehicle passes during its daily routine of driving on the public streets of its respective city or town, visiting last known addresses of debtors in their efforts to locate vehicles to repossess on behalf of automobile lenders.  In addition to photographing license plates, the system collects metadata which include the date and time the photograph was taken and the GPS location of the camera at the time the photograph was taken.  Collectively, these photographs and metadata are referred to as "LPR Data", and are defined as such in the License Agreements executed by the Defendants.  DRN's valuable LPR Data is stored in a password-protected database in a secure data center located in Dallas, Texas.

13.     DRN also maintains a database of license plates registered to vehicles that are sought for repossession by lending institutions that DRN serves.  This database, or list of license plates sought for repossession, is known as the "LPR Hotlist", and is defined as such in the License Agreements executed by the Defendants.  Once an ALPR system converts a license-plate image into computer-readable text, DRN's proprietary software simultaneously cross-checks the alphanumeric characters from the license plate against DRN's LPR Hotlist, and produces a "Hit" when a scanned license plate matches up with a vehicle on DRN's Hotlist designated for repossession by DRN clients.  DRN then disseminates the matching license plate data to its clients, including automobile lenders and insurance companies, who then pay DRN as much as three hundred and fifty dollars ($350.00) for each vehicle located and repossessed. DRN earns substantial revenue by selling this license plate data to its clients.  DRN then in turn shares such revenue with its repossession licensees such as the Defendants in accordance with the respective Schedule 1 of each Defendant's License Agreement.

**B.    THE LICENSE AGREEMENTS EXECUTED BY THE DEFENDANTS**

14.    At the time that DRN sells an ALPR system, DRN enters into one or more agreements with the purchaser of the system.   In most instances, including each of the Defendants, DRN will sell certain camera and digital signal processing hardware manufactured by, or for, Vigilant, and DRN will license use of the DRN System which includes, but is not limited to, DRN Car Detector software, DRN WebRepo software, the DRN Portal software application, all firmware contained on the DSPs, and all OCR software contained on a laptop and DSP provided by DRN to its licensee.

15.    Each of the Defendants executed separate License Agreements on or about March 27, 2014.  Each of the Defendants has operated as a DRN licensee since at least April 5, 2013, utilizing DRN's highly proprietary systems.  Each Defendant has utilized DRN's Car Detector software to scan license plates and to create LPR data, as well as the DSP firmware and OCR software as contemplated by the License Agreements.   In doing so, Defendants have profited handsomely by use of DRN's system, and have been paid the following amounts by DRN pursuant to the terms of the License Agreements:

| | |
|---|---|
| Accurate Adjustment | $60,521.39 |
| After Hours | $115,782.42 |
| Coastline | $286,422.39 |
| Solid Solutions | $121,083.38 |
| Total | $583,809.58 |

16.    The License Agreements executed by the Defendants grant each Defendant a non-exclusive, non-transferable license to access the DRN System[1] solely in accordance with the

---

[1] The License Agreement defines DRN System as follows: "**DRN System**" means the DRN Car Detector, DRN WebRepo, the DRN Portal, the DRN Intellectual Property Rights, and all other equipment, software, hardware, materials and information provided by DRN to DRN Affiliate pursuant to this Agreement, including all enhancements, upgrades, improvements, changes, modifications, revisions or derivative works made to same from time to time.

terms of the Agreement. The License Agreements executed by Defendants also set forth the authorized uses of the DRN System by Defendants, and prohibit other uses of the system not allowed under the terms of the Agreement. Section 2(d) of the License Agreement specifically prohibits Defendants as follows:

> **Restrictions on Use of DRN System.** Except as expressly permitted under this Agreement, DRN Affiliate agrees that it shall not, nor permit a Related Party or any other party to, without the prior written consent of DRN, (i) copy, duplicate or grant permission to the DRN System or any part thereof; (ii) create, attempt to create, or grant permission to the source program and/or object program associated with the DRN System; (iii) decompile, disassemble or reverse engineer any software component of the DRN System for any reason, including, without limitation, to develop functionally similar computer software or services; (iv) modify, alter or delete any of the copyright notices embedded in or affixed to the copies of any components of the DRN System; or (v) make, retain, or distribute copies of LPR Data or Hits, including, without limitation, through data retention using storage drives, splitters, or other such devices. DRN Affiliate shall instruct each Related Party to comply with the preceding restrictions.

17.     The License Agreements executed by the Defendants clearly and unequivocally establish that (i) Plaintiff owns all LPR Data, the DRN System, and DRN Intellectual Property and (ii) nothing in the agreement shall be deemed to convey to Defendants or to any other party any ownership interest in or to the LPR Data, the DRN System or the DRN Intellectual Property.

18.     In addition to clearly establishing the license and uses granted to Defendants, the License Agreements define the term "Confidential Information" and set forth the guidelines for each Defendant's access to, and permitted uses of, DRN's Confidential Information. The term Confidential Information includes, but is not limited to trade secrets, the DRN System, LPR Data, "Hits", and the DRN Intellectual Property. Importantly, the License Agreements clearly delineate Defendants' restrictions related to the use, disclosure, or reproduction of the Confidential Information of Plaintiff. Specifically, Section 11(c)(3) sets forth the following identical restriction language in each of the four License Agreements executed by Defendants:

**Restrictions.** As a result of the sensitive nature of the Confidential Information, DRN Affiliate agrees, except as otherwise permitted by this Agreement: (i) not to directly or indirectly disclose any portion of the Confidential Information to any third party; (ii) not to copy or reproduce any portion of the Confidential Information; (iii) not to sell, transfer, license use or otherwise exploit the Confidential Information in any way; (iv) if DRN Affiliate is an entity, only to disclose the Confidential Information to Related Parties who have a need to know the Confidential Information and who agree to be bound by this Agreement; (v) to take all necessary precautions to protect the Confidential Information against its unauthorized use or disclosure and exercise at least the same degree of care in safeguarding the Confidential Information as DRN Affiliate would with DRN Affiliate's own confidential information; and (vi) to promptly advise DRN in writing upon learning of any unauthorized use or disclosure of the Confidential Information. DRN Affiliate shall be liable for the actions of Related Parties to whom DRN Affiliate discloses any Confidential Information.

19.     Section 11(c)(5) of the License Agreement requires Defendants to destroy all Confidential Information and certify in writing that the Defendants have done so, upon termination.

20.     DRN has invested substantial time, energy, and money into the development of its Confidential Information and trade secrets, which includes, among other things, the development of the LPR Data collected by Licensees, as well as an array of other confidential customer data including customer volume and pricing strategies, research, product plans, products, services, customer lists, markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information. Knowledge of this information has allowed DRN to compete in the automobile finance, automobile insurance, and vehicle repossession industries by competitively delivering quality products and catering to the specific needs and special characteristics and requirements of each of its customers. DRN has gained significant competitive and technological advantages from the fact that such proprietary information is not generally known to the public.

21.     DRN has undertaken a number of measures to ensure that its Confidential Information remains secret, including performing work in a secured facility, utilizing a security badge system, maintaining password protected databases, maintaining password-protected software, maintaining data on an internal password-protected network, and requiring licensees to execute confidentiality and non-disclosures provisions in their License Agreements.   These measures were taken by DRN to ensure that DRN's Confidential Information did not inadvertently become public or fall into the hands of competitors.   DRN required Defendants to comply with each of these requirements.

22.     Section 11 of each License Agreement contains each Defendant's express and unambiguous promise, as an inducement for DRN to enter into the License Agreement and allow Defendants to participate in DRN's network of affiliates, that Defendants will not compete with DRN during the term of their License Agreements and for a period of one (1) year thereafter. Specifically, during that restricted period, Defendants promise that they will not directly or indirectly engage or invest in, own, manage, operate, finance, control or participate in the ownership, management, operation, financing or control of, or by employed by or associated with, or render services to, any person or entity engaged in the business of using LPR technology and data for the purpose of recovering vehicles for the financial or lending industries.

23.     Also in Section 11 of each License Agreement, each of Defendants specifically agreed that this restriction was reasonable in duration and scope.  Each of Defendants further agreed to cause all their respective officers, directors, employees, shareholders, members, partners, agents, and other representatives to comply with this clear noncompetition obligation. Each of Defendants agreed that their breach of such provision would cause irreparable harm to DRN, such that DRN would be entitled to enforce such obligation by way of equitable relief.

Each of Defendants further agreed that this restriction would survive any termination of the License Agreements.

24.    Under Section 17(b) of each License Agreement, each of the Defendants agreed that the License Agreement would be governed by and construed under the laws of the State of Texas without regard to conflict of laws principles that would require the application of any other law.   Section 17(c) of each License Agreement further sets forth each Defendant's agreement to allow Plaintiff to enforce any provision of the Agreement by a decree of specific performance and by way of temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement, without posting any bond or other undertaking.

25.    Section 11(d) of the License Agreements further contains each Defendant's contractual promise not to disparage DRN, its business or its LPR technology during the term of the License Agreements and for a period of one (1) year thereafter.

## C.    PLAINTIFF BECOMES AWARE OF DEFENDANTS' POTENTIAL BREACH OF THE LICENSE AGREEMENTS

26.    In August of 2014, DRN received information that Defendants were directly or indirectly utilizing a web address owned or operated by Mr. Shane Freitas, the President of Defendant Accurate, bearing the URL of http://www.lprsearch.com.  Defendants have used this site and portal for the purposes of accessing and/or using LPR technology and data to recover vehicles for the financing and lending industries, in clear and deliberate violation of their contractual obligations to DRN.

27.    In an effort to verify the information provided to DRN regarding Freitas' ownership and/or control of the website located at http://www.lprsearch.com, DRN attempted to determine the exact ownership of such domain and website.  DRN's investigation determined that the domain was created through Network Solutions, LLC on November 27, 2013, and the

registrant of such domain at that time was an entity named "RepoTrack" located at 1210 Auto Center Dr., Lodi, CA 95242. This is the physical address of Defendant Accurate. The administrative and technical email addresses for the domain at that time were shane@accadj.com, which is the email address of Freitas, the President of Defendant Accurate. DRN's investigation further showed that the Internet Protocol ("IP") address where that domain was being hosted until September 14, 2014 (fourteen days after Defendants were hand-delivered a Notice of Breach Letter prepared by DRN's legal counsel) was http://75.147.231.245. As of the filing of this action, this IP address resolves to the webmail login page of Defendant Accurate.

28.     Plaintiff asserts that, at all relevant times, Defendants Accurate and Freitas and their agents and representatives were in control of and owned the www.lprsearch.com domain and website, where Defendants are utilizing LPR Data and pursuing their own independent operations as repossession companies, without compensation to Plaintiff. Plaintiff also asserts that Defendants are attempting to create their own regional or national database in an effort to be a direct competitor to Plaintiff in violation of the License Agreements.

**D.   MEETING WITH CERTAIN DEFENDANTS ON AUGUST 25, 2014**

29.     On August 25, 2014 Chris Metaxas, the Chief Executive Officer of Plaintiff, met in person in Sacramento, California with Freitas, the President of Defendant Accurate, and Wes Englebrecht ("Englebrecht"), the President of Defendant After Hours Auto Recovery. At this meeting, DRN hand-delivered a letter to Freitas and Englebrecht, notifying them that they were in breach of their DRN License Agreements. DRN also e-mailed the letter to Scott Fernaro, President of Defendant Coastline. DRN further discussed with Freitas and Englebrecht an opportunity to cure their breach under the License Agreement. During this meeting, Freitas

vaguely acknowledged some involvement with the website located at www.lprsearch.com, but denied any ownership interest therein.

30.     In light of these denials, DRN requested at the meeting that Freitas log into the lprsearch.com website so that Freitas could demonstrate that such website did not constitute a breach of the License Agreement.  Freitas refused.  Freitas and Englebrecht then excused themselves from the meeting for the stated purpose of contacting the President of Defendant Coastline to discuss the breach notice delivered by DRN.  Upon returning to the meeting approximately one hour later, Freitas logged into the lprsearch.com website, which immediately displayed a page indicating that such website was not operable.  Metaxas requested that Freitas show the administrative section of the website, and Freitas again refused.  DRN has determined, and asserts upon information and belief, that during the hour that Freitas and Englebrecht were away from the California meeting, Freitas changed the website code of lprsearch.com in an effort to deceive DRN and to make it appear that the website was inoperable and/or still under development.

31.     The meeting concluded with DRN advising Freitas and Englebrecht that Defendants had ten days within which to cure their breach of the License Agreements. Defendants subsequently refused to cure the breach, and their access to DRN's Webrepo software and DRN's Portal software application was terminated.

E.     **PLAINTIFF OBTAINS ADDITIONAL SUPPORTING EVIDENCE OF DEFENDANTS' ONGOING BREACH OF THE LICENSE AGREEMENTS**

32.     Plaintiff has recently learned that, on August 26, 2014 (the day after the above referenced California meeting), Freitas and Defendant Accurate acquired the domain of www.rtcasemanager.com, and two days later that domain name's Internet Protocol address was changed to 75.147.231.245. As stated above, the IP address of http://75.147.231.245 resolves to

the webmail login page of Defendant Accurate as of the date of the filing of this action. Additionally, the login page to www.rtcasemanager.com is identical to the previous login page of www.lprsearch.com.

33.     DRN has determined that Defendants are continuing to operate license plate recognition cameras and are continuing to use LPR technology and data to recover vehicles for the lending and financial industries. DRN has also determined, and asserts on information and belief, that Defendants are using and/or storing LPR Data in one or more databases which may be accessed by logging into www.rtcasemanager.com.

34.     DRN has also determined that Defendants, in connection with their wrongful and ongoing activities in violation of their noncompetition obligations, are continuing to wrongfully use DRN's Confidential Information without DRN's permission, including but not limited to DRN's Car Detector software and DSP software. Defendants have wrongfully obtained access to, or obtained or used data and information from, the DRN System and associated databases without DRN's consent and by unauthorized and improper means. DRN asserts on information and belief that Defendants surreptitiously accessed and/or duplicated DRN's LPR Hotlist and LPR Data, and used such wrongfully-obtained information and data for their own financial benefit in violation of the License Agreements. DRN further asserts on information and belief that Defendants have used the information and data wrongfully obtained from DRN in an attempt to set up their own national network or otherwise compete with DRN.

35.     The License Agreements specifically provide that DRN has the right to inspect Defendants' records related to all vehicles on DRN's LPR Hotlist that were repossessed by Defendants pursuant to authorized and unauthorized Hits generated by DRN's system. Despite demand, Defendants have refused to allow DRN's inspection, in a further effort to conceal their improper conduct. Further, by way of correspondence from their counsel, Defendants have now

taken the position (notwithstanding the survival language of Section 5(c) of the License Agreements) that because the License Agreements are terminated, Defendants have no further obligations thereunder to DRN.

36.     DRN has also learned that one or more Defendants are actively disparaging DRN within the repossession industry, in further violation of their contractual obligations under Section 11(d) of the License Agreements.

37.     All conditions precedent to DRN's claims and rights to recovery hereunder have occurred and/or been performed.

## V.     CAUSES OF ACTION

### COUNT ONE – Breach of Contract

38.     DRN reasserts and by this reference hereby incorporates the allegations contained in the above paragraphs 9 through 37 as if fully set forth herein.

39.     Defendants' actions are in breach of their respective License Agreements. Defendants' breaches include but are not limited to breach of their contractual obligations under Section 2(d) to refrain from (i) copying, duplicating or granting permission to the DRN System or any part thereof, and (ii) creating, attempting to create, or granting permission to the source program and/or object program associated with the DRN System.

40.     Defendants' breaches also include breach of their contractual obligations under Section 11(c)(3) (i) not to directly or indirectly disclose any portion of the Confidential Information to any third party; (ii) not to copy or reproduce any portion of the Confidential Information; (iii) not to sell, transfer, license use or otherwise exploit the Confidential Information in any way; (iv) if DRN Affiliate is an entity, only to disclose the Confidential Information to Related Parties who have a need to know the Confidential Information and who agree to be bound by this Agreement; (v) to take all necessary precautions to protect the

Confidential Information against its unauthorized use or disclosure and exercise at least the same degree of care in safeguarding the Confidential Information as DRN Affiliate would with DRN Affiliate's own confidential information; and (vi) to promptly advise DRN in writing upon learning of any unauthorized use or disclosure of the Confidential Information.

41.     Defendants' breaches further include but are not limited to breach of their contractual obligations under the non-competition agreement in Section 11(a) to refrain (during the Term of the License Agreement and for a one-year period immediately following the termination of the License Agreement) from, directly or indirectly: engaging or investing in, owning, managing, operating, financing, controlling or participating in the ownership, management, operation, financing or control of, or being employed by, associated with or in any manner connected with, or rendering services or advice or other aid to, or guaranteeing any obligation of, any person or entity engaged in or planning to become engaged in the business of using LPR technology and LPR data for the purpose of recovering vehicles sought for recovery within the financial, lending or insurance industries or assisting in debt collection efforts on behalf of municipalities and governmental entities.

42.     Defendants' breaches also include but are not limited to their failure and refusal, despite demand, to honor their contractual obligations to allow access to and inspection of Defendants' records to determine Defendants' compliance (or lack thereof) with the License Agreements.

43.     Such breaches also include Freitas and Defendant Accurate's disparagement of DRN within the repossession industry, in violation of their contractual obligations under Section 11(d) of the License Agreements.

44.     These breaches, individually and collectively, have proximately caused damages to DRN, for which damages DRN hereby sues.

## COUNT TWO – Misappropriation of Trade Secrets

45.     DRN reasserts and by this reference incorporates the allegations contained in the above paragraphs 9 through 37 as if fully set forth herein.

46.     DRN owns trade secrets in the form of Confidential Information, which includes confidential and proprietary compilations, methods, techniques, processes, and data, among other practices and procedures, in operating its business to give it a competitive advantage.  The trade secrets are not known outside DRN's business, and are the subject of efforts that are reasonable under the circumstances to maintain secrecy.  A select group of DRN employees and licensees has knowledge of the trade secrets.  DRN derives independent economic value from the trade secrets not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

47.     In direct and deliberate violation of the Texas Uniform Trade Secrets Act, Defendants have acquired DRN's trade secrets through a confidential relationship and disclosed or used the trade secrets without express or implied consent at a time they knew or had reason to know that (i) their knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use and (ii) they had a duty to DRN to maintain secrecy and limit trade secret use.  Defendants' conduct was intentional and done for the value and benefit associated with such misappropriation, and in an attempt to financially profit from the utilization of such trade secrets, and/or to financially harm DRN.  Defendants employed improper means by breaching their duties to maintain secrecy of the trade secrets, limit their use, and prohibit their discovery, as required by statutory and common law and the License Agreements.

48.     DRN has suffered injury and resulting damages from Defendants' conduct, for which damages DRN hereby sues.

## COUNT THREE – Attorney's Fees

49.     DRN reasserts and by this reference incorporates the allegations contained in the above paragraphs 9 through 37 as if fully set forth herein.

50.     Defendants are liable for DRN's attorney's fees and expenses pursuant to Texas Civil Practice & Remedies Code § 38.001, for which amounts DRN hereby sues.  DRN also seeks attorney's fees pursuant to Texas Civil Practice and Remedies Code § 134A.005 (based on Defendants' willful and malicious misappropriation) and Texas Civil Practice and Remedies Code Ch. 143 (based on harmful access by computer).

## COUNT FOUR -- Violations of Computer Fraud and Abuse Act (18 U.S.C. §1030)

51.     DRN reasserts and by this reference incorporates the allegations contained in the above paragraphs 9 through 37 as if fully set forth herein.

52.     Defendants are within the scope of the Computer Fraud and Abuse Act, 18 U.S.C. §1030 (the "Act").

53.     Defendants' conduct as described herein violates Section 1030(a)(4) of the Computer Fraud and Abuse Act, 18 U.S.C. 1030(a)(4).  Specifically, Defendants knowingly and with intent to defraud, accessed a protected computer without authorization, or exceeded their authorized access, and by means of such conduct furthered the intended fraud and obtained monetary value by way of the information improperly obtained by such actions.

54.     Defendants' conduct as described herein violates Section 1030(a)(5)(C) and Section 1030(c)(4)(A)(i)(I) of the Act.  *See* 18 U.S.C. §1030(c)(4)(A)(i)(I).

55.     Section 1030(g) of the Act provides, in pertinent part:

> Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief.

56.     Defendants' conduct as described herein has caused significant damage to DRN, for which damage DRN hereby sues and seeks injunctive relief as set forth herein.

**COUNT FIVE – Harmful Access by Computer (Tex. C.P.R.C. Chapter 143)**

57.     DRN reasserts and by this reference incorporates the allegations contained in the above paragraphs 9 through 37 as if fully set forth herein.

58.     Defendants' conduct is in violation of Chapter 33 of the Texas Penal Code in that they knowingly or intentionally accessed DRN's computer, computer network or computer system without DRN's effective consent. *See, e.g.*, TEX. PENAL CODE §33.02(a) ("A person commits an offense if the person knowingly accesses a computer, computer network, or computer system without the effective consent of the owner."); TEX. PENAL CODE §33.02(b-1) ("A person commits an offense if with the intent to defraud or harm another or alter, damage, or delete property, the person knowingly accesses a computer, computer network, or computer system without the effective consent of the owner.").  As such, Defendants are liable under Chapter 143 of the Texas Civil Practice and Remedies Code.

59.     Defendants' conduct as described herein has caused significant damage to DRN, for which damage DRN hereby sues.  DRN also sues for its reasonable attorneys' fees and costs as allowed by statute.

**COUNT SIX – Injunctive Relief**

60.     DRN reasserts and by this reference incorporates the allegations contained in the above paragraphs 9 through 59 as if fully set forth herein.

61.     DRN's application for a preliminary injunction is authorized by Federal Rule of Civil Procedure 65.  "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

62.     A movant must satisfy each of four criteria in order to be entitled to a preliminary injunction: (1) a substantial likelihood of success on the merits, (2) irreparable injury, (3) a favorable balance of hardships, and (4) no adverse effect on the public interest.

63.     DRN is entitled to all or part of the relief requested in this proceeding, and such relief further requires the restraint of Defendants' conduct that otherwise would be prejudicial to DRN.  In addition, Defendants' prior and ongoing actions in violation of DRN's rights would render a judgment in litigation ineffectual.  Moreover, DRN is entitled to an injunction under recognized principles of equity and applicable statutory law relating to injunctions as well as under the express terms of the License Agreements executed by Defendants.  Defendants specifically agreed in Section 11(e)(3) of the License Agreements that "a breach or threatened breach by DRN Affiliate or any Related Party of any covenant contained in this Section 11 may cause irreparable damage to DRN and that DRN may not be made whole by monetary damages.  Therefore, DRN may have, in addition to any remedies available at law, the right to seek equitable relief to enforce this Agreement."  Further, irreparable injury to DRN's business, as well as its highly confidential and proprietary compilations, methods, techniques, processes, and data, among other practices and procedures, are threatened irrespective of any remedy at law.  The injunctive relief requested by DRN is the least restrictive means to prevent irreparable injury to DRN.

64.     DRN asks the Court to enjoin Defendants from engaging in the below-specified wrongful acts pending a trial on the merits.  DRN can meet its burden to show a substantial likelihood of success on the merits as well as the other elements of injunctive relief, given Defendants' blatant violations of the Licensing Agreements and contractual and other legal duties owed by Defendants to DRN.

65.     As to the Licensing Agreements, injunctive relief is proper to enforce the non-competition agreement in Section 11(a) of the License Agreements.  A confidentiality covenant can embrace more than "trade secrets" and includes designated items.  *Simplified Telesys, Inc. v. Live Oak Telecom, L.L.C.*, 68 S.W.3d 688, 692-93 (Tex. App.-Austin 2000, pet. denied). Injunctive relief is proper in cases in which a party violates a confidentiality covenant intended to protect more than the secrecy of information; and such relief is also intended to protect against violence to the confidential relationship and the covenants governing the acquisition of confidential information.  *Id.*  Here, Defendants agreed to maintain confidentiality as to DNR's Confidential Information and the DNR Intellectual Property (as defined in the Licensing Agreements), including but not limited to the DRN Car Detector software and DSP software.  As such, injunctive relief is proper given Defendants' undisputed misappropriation, use, and disclosure of the foregoing.  Injunctive relief is also proper to enforce the non-competition agreement in Section 11(a) of the License Agreements.  *See* TEX. BUS. & COMM. CODE §15.51(a) ("[A] court may award the promisee under a covenant not to compete damages, injunctive relief, or both damages and injunctive relief for a breach by the promisor of the covenant.").

66.     If Defendants are not prohibited from these actions, harm is imminent and irreparable because DRN is the owner of confidential and proprietary information that is unique and valuable, the dissipation or misuse of which is not fully compensable to DRN in money damages.  Harm is further imminent and irreparable because Defendants will continue to wrongfully compete with DRN.  Further, DRN's damages are not at this time reasonably susceptible to precise measurement or calculation.  DRN believes that Defendants will alter the status quo and further violate DRN's legal rights unless they are temporarily and permanently enjoined.  Moreover, the injunctive relief requested by DRN is the least restrictive means to prevent irreparable injury to DRN.

67.     DRN has no adequate remedy at law because, among other things, DRN's past and ongoing damages from such conduct, and threatened future conduct, are incapable of calculation.  Moreover, due to Defendants' violation of DRN's legal obligations involving its highly confidential and proprietary information, and Defendants' noncompetition obligations, no remedy at law is as practical and efficient as injunctive relief preventing such violations.

68.     Specifically, DRN requests that a preliminary and permanent injunction be granted restraining each of the Defendants, their officers, agents, servants, employees, attorneys, and other persons or entities who are in active concert or participation with them, from directly or indirectly:

(a)     taking any action to use, divulge, disclose, access, disseminate, communicate or transfer information regarding DRN's proprietary information, compilations, methods, techniques, processes, and data, or any other DRN practice or procedure used in its operations that was learned or obtained by Defendants by means of their contracts and agreements with DRN, including but not limited to DNR's Confidential Information and the DNR Intellectual Property (as defined in the Licensing Agreements), DRN Car Detector software and DSP software;

(b)     taking any action to use, divulge, disclose, access, disseminate, communicate, hypothecate, encumber, convey, transfer or convert any tangible or physical documents, data, or other property of any kind or character owned by DRN or removed at any time from DRN's premises or systems, including but not limited to DNR's Confidential Information and the DNR Intellectual Property (as defined in the Licensing Agreements), DRN Car Detector software and DSP software;

(c)    Engaging or investing in, owning, managing, operating, financing, controlling or participating in the ownership, management, operation, financing or control of, or being employed by, associated with or in any manner connected with, or rendering services or advice or other aid to, or guaranteeing any obligation of, any person or entity engaged in or planning to become engaged in the business of using LPR technology and LPR data for the purpose of recovering vehicles sought for recovery within the financial, lending or insurance industries or assisting in debt collection efforts on behalf of municipalities and governmental entities; and

(d)    destroying, transferring, conveying, assigning, moving or removing, altering, alienating or hiding any DRN documents, communications or materials existing in hard paper form, or DRN documents, communications (including electronic mail and text messages), materials or data existing on servers, computers, hard drives, disks, tapes or other electronic media, as well as on any internet "cloud" host or server, under the control or constructive control or possession of any of the Defendants or their agents, attorneys or representatives, or to which they have access, to the extent they were obtained by Defendants during or in connection with their affiliation with DRN, including but not limited to DNR's Confidential Information and the DNR Intellectual Property (as defined in the Licensing Agreements), LPR Data, LPR Hotlist, Hits, the DRN System, DRN Car Detector software, DRN WebRepo software, the DRN Portal software application, all firmware contained on the DSPs, and all OCR software contained on the laptop and DSP.

69.     DRN further requests that a preliminary injunction, and ultimately a mandatory and permanent injunction, be granted requiring each of the Defendants, their officers, agents, servants, employees, attorneys, and other persons or entities who are in active concert or participation with them, to preserve and immediately turn over to DRN, and ultimately upon further order by the Court permanently delete from any computers, electronic equipment or other storage devices, all documents, data and other property of any kind or character whatsoever within Defendants' actual or constructive possession, custody or control, or to which they have access, including but not limited to the following:

(a)     documents, communications or materials existing in hard paper form, or documents, communications (including electronic mail and text messages), materials or data existing on servers, computers, hard drives, disks, tapes or other electronic media, as well as on any internet "cloud" host or server, under the control or constructive control or possession of Defendants or their agents, attorneys or representatives, or to which they have access, that document, discuss, reflect, or contain DRN communications, compilations, methods, techniques, processes, and data, or any other DRN practice or procedure used in its operations that was obtained by Defendants by means of their affiliation with DRN, including but not limited to DNR's Confidential Information and the DNR Intellectual Property (as defined in the Licensing Agreements), LPR Data, LPR Hotlist, Hits, the DRN System, DRN Car Detector software, DRN WebRepo software, the DRN Portal software application, all firmware contained on the DSPs, and all OCR software contained on the laptop and DSP; and

b)     any other tangible or physical property of any kind or character owned by DRN or removed at any time from DRN premises, servers or systems.

70.    DRN is willing to post a bond for the injunctive relief requested herein.

## VI.    CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, DRN prays that Defendants be cited to appear and answer herein and that upon final hearing and trial, DRN be awarded judgment for actual damages, attorney's fees, costs, pre-judgment and post-judgment interest at the maximum rates allowable by law, preliminary and permanent injunctive relief as requested above, and any other or further relief to which DRN may be legally or equitably entitled.

Respectfully submitted,

By:  _____

**Cole B. Ramey**
State Bar No. 16494980
**W. Alan Wright**
State Bar No. 22062700

**CROUCH & RAMEY, LLP**
2001 Ross Avenue, Suite 4400
Dallas, Texas  75201
Telephone:  (214) 922-7100
Facsimile:  (214) 922-7101
E-mail:  cramey@crouchfirm.com
         awright@crouchfirm.com

- and -

Douglas R. Hudman
State Bar No. 10149860
Matthew R. Hudman
State Bar No. 24041143
**HOLLAND, JOHNS & PENNY, LLP**
306 W. 7th Street, Suite 500
Ft. Worth, Texas  76102
Telephone:  (817) 335-1050
Facsimile:  (817) 332-3140
E-mail:  drh@hjpllp.com

**ATTORNEYS FOR PLAINTIFF**
**DIGITAL RECOGNITION NETWORK, INC.**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on the 24th day of November, 2014, a true and correct copy of the foregoing document was forwarded to the following counsel of record via email and Certified Mail, Return Receipt Requested:

Peter M. Spingola
Sara Siegall
CHAPMAN SPINGOLA, LLP
77 West Wacker Drive, Ste. 4800
Chicago, Illinois 60601
pspingola@chapmanspingola.com
ssiegall@chapmanspingola.com

Gina Viccinelli
Kenneth Riney
HERMES SARGENT BATES, LLP
901 Main Street, Ste. 5200
Dallas, Texas 75202
gina.viccinelli@hsblaw.com
ken.riney@hsblaw.com

W. Alan Wright