

ORIGINAL

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JAN 2 0 2016
4:55 pm

CLERK, U.S. DISTRICT COURT
By _____
                Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| DIGITAL RECOGNITION NETWORK, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | Civil Action No. 4:14-CV-00903-A |
| ACCURATE ADJUSTMENTS, INC.; COASTLINE RECOVERY SERVICES, INC.; AFTER HOURS AUTO RECOVERY; and SOLID SOLUTIONS 24/7, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF DIGITAL RECOGNITION NETWORK, INC.'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Cole B. Ramey
State Bar No. 16494980
W. Alan Wright
State Bar No. 22062700
**KILPATRICK TOWNSEND & STOCKTON**
2001 Ross Avenue, Suite 4400
Dallas, Texas  75201
Telephone:  (214) 922-7100
Facsimile:  (214) 922-7101
E-mail:  cramey@kilpatricktownsend.com
           alan.wright@kilpatricktownsend.com

Douglas R. Hudman
State Bar No. 10149860
Matthew R. Hudman
State Bar No. 24041143
**HOLLAND, JOHNS & PENNY, LLP**
306 W. 7th Street, Suite 500
Ft. Worth, Texas  76102
Telephone:  (817) 335-1050
Facsimile:  (817) 332-3140
E-mail:  drh@hjpllp.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

Page

I.    SUMMARY OF DRN'S MOTION ........................................................... 1

   A.   Sherman Act, Section 2 ............................................................... 1

   B.   Breach of Contract ...................................................................... 2

   C.   Novation ....................................................................................... 2

   D.   Accord and Satisfaction ............................................................. 2

   E.   Limitations ................................................................................... 3

II.   Statement of Undisputed Material Facts ......................................... 4

   A.   DRN's Role In The Auto Finance Industry. ............................. 4

   B.   The License Agreements Executed By Defendants ................. 4

   C.   The DRN System. ........................................................................ 6

   D.   Defendants Use The Sync Tool To Make And Retain Copies Of LPR Data. ..................... 9

   E.   Defendants Continue to Use DRN Car Detector Software Post-Termination. ................... 9

   F.   DRN Files This Lawsuit And Defendants File A Counterclaim. ....................................... 10

III.  ARGUMENT AND AUTHORITIES ................................................. 11

   A.   Summary Judgment Standard. .................................................. 11

   B.   DRN Is Entitled To Summary Judgment On Defendants' Antitrust Claim ...................... 12

      1.   The Alleged Facts Do Not Support An Antitrust Claim. ........................................... 12

      2.   Defendants Cannot Demonstrate An Antitrust Injury. ............................................. 16

      3.   Defendants Cannot Show Damages Flowing from any Alleged Anticompetitive Act. .. 18

      4.   The Noncompetes Do Not Foreclose A Substantial Share Of Competition. ................. 19

      5.   Mandatory Reformation Bars Defendants' Antitrust Claim. ........................................ 20

      6.   The Noncompetes are Reasonable and Ancillary to Valid Contracts. ........................... 21

   C.   DRN Is Entitled To Summary Judgment On Defendants' Breach Of Contract Claim. .... 22

    1.   Defendants Cannot Meet The Elements Of A Breach Of Contract Claim................... 22

    2.   The Limitation of Liability Clause Bars Defendants' Breach of Contract Claim........... 25

  D.  DRN Is Entitled To Summary Judgment On Its Affirmative Defense of Novation. .......... 26

  E.  DRN Is Entitled To Summary Judgment On Its Affirmative Defense of Accord And Satisfaction................................................................................................ 28

  F.  DRN Is Entitled To Summary Judgment On Defendants' DTPA Claim. ......... 29

    1.   Legal Standard for Application of Statute of Limitation. ............................... 29

    2.   The Two-Year Statute Of Limitations Bars Defendants' DTPA Claims..................... 30

    3.   Defendants' Cannot Meet The Reliance Or Producing Cause Of Their DTPA Claim ................................................................................................... 33

  G.  DRN Is Entitled To Summary Judgment On Defendants' Liability For Breach of Contract.......................................................................................................... 35

    1.   Use of the Sync Tool to Make and Retain Copies of the LPR Data .............................. 35

    2.   Use of the DRN Car Detector Software after termination of the License Agreements....................................................................................................... 37

  H.  DRN Is Entitled To Its Attorneys' Fees And Expenses Under the DTPA. ....................... 38

IV.    CONCLUSION AND PRAYER ................................................................. 39

# TABLE OF AUTHORITIES

Page

## Cases

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534
(1983) ................................................................................................................. 16

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)................................... 17

*Baker v. Great N. Energy, Inc.*, No. 3:14-CV-0240-B, 2014 WL 6805483, at *3 (N.D. Tex. Dec.
3, 2014)........................................................................................................ 2, 22, 35

*Barkhausen v. Craycom, Inc.*, 178 S.W.3d 413, 422 (Tex. App.—Houston [1st Dist.] 2005, pet.
denied) ............................................................................................................ 38

*Baton Rouge Oil & Chem. Workers Un. v. ExxonMobil Corp.*, 289 F.3d 373, 375
(5th Cir. 2002) ................................................................................................... 11

*Bayou Bend Towers Council of Co. Owners v. Manhattan Constr. Co.*, 866 S.W.2d 740, 742
(Tex. App.—Houston [14th Dist.] 1993, writ denied) ............................................. 3, 30

*Beijing Metals & Minerals Imp./Exp. Corp. v. Am. Bus. Ctr., Inc.*, 993 F.2d 1178, 1182-83 (5th
Cir. 1993) ........................................................................................................ 23

*Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1185 (5th Cir.1988)........................................................ 17

*Bueckner v. Hamel*, 886 S.W.2d 368, 372 (Tex. App.—Houston [1st Dist.] 1994,
writ denied) .................................................................................................... 3, 28

*Bumstead v. Jasper Cnty.*, 931 F.Supp 1323, 1328 (E.D.Tex. 1996) .......................................... 12

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) .................................................................. 11

*Chastain v. Cooper & Reed*, 257 S.W.2d 422, 424 (Tex. 1953) ................................................ 27

*Citi Priesmeyer, Inc. v. K & O*, 164 S.W .3d 675, 681 (Tex.App.-Austin 2005, no pet.) ........... 27

*City of Houston v. First City*, 827 S.W.2d 462, 472 (Tex. App.—Houston [1st Dist.] 1992,
writ denied) .................................................................................................... 3, 28

*Commc'ns Integrated Sys., L.P. v. Lockheed Martin Corp.*, No. 3:07-CV-0341-B, 2008 WL
4391020, at *3 (N.D. Tex. Sept. 29, 2008) .................................................... 1, 12, 17

*Council of Co. Owners v. Manhattan Constr. Co.*, 866 S.W.2d at 742 ...................................... 30

*Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 566 (S.D. Tex. 2014) ................. 2, 13, 21

*DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681 (Tex. 1990) ................................................ 21

*Dimmitt Agric. Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 525 (5th Cir. 1982) .................... 1, 12

*Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995)........................... 35

*Ensley v. Spickard*, 232 S.W.2d 780 (Tex.Civ.App. Dallas 1950, writ ref'd) ............................. 28

*Flint & Assoc. v. Pipe & Steel, Inc.*, 739 S.W.2d 622, 624-25 (Tex.App.—Dallas 1987, writ
denied).................................................................................................................................. 38

*Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)..................................................... 11

*Four Bros. Boat Works, Inc. v. Tesoro Pet. Cos.*, 217 S.W.3d 653, 663-64 (Tex. App.—Houston
[14th Dist.] 2006, pet. denied)............................................................................................. 30

*Fox Elec. Co., Inc. v. Tone Guard Sec., Inc.*, 861 S.W.2d 79, 82 (Tex. App.—Fort Worth 1993,
no writ) ................................................................................................................................. 25

*Fulcrum Cent. v. AutoTester, Inc.*, 102 S.W.3d 274, 277-78 (Tex. App.—Dallas 2003, no pet.) 26

*Gartrell v. Gaylor*, 981 F.2d 254, 257 (5th Cir. 1993)............................................................. 3, 29

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013) ........................... 17

*Global Octanes Texas, L.P. v. BP Exploration & Oil Inc.*, 154 F.3d 518, 521 (5th Cir. 1998) ... 25

*Gonzales v. Southwest Olshan Found. Repair Co.*, 400 S.W.3d 52, 57 (Tex. 2013) ................... 30

*Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 67 (Tex. App.-
Houston [1st Dist.] 2011, pet. denied) ................................................................................ 25

*Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 465 (5th Cir. 2003)............................ 21

*Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979) .................................................................... 28

*Honeycutt v. Billingsley*, 992 S.W.2d 570, 576-77 (Tex. App.—Houston [1st Dist.] 1999, pet.
denied)......................................................................................................................... 2, 26, 28

*Hubacek v. Ennis State Bank*, 159 Tex. 166, 317 S.W.2d 30 (1958) .......................................... 23

*Jack H. Brown & Co. v. Toys "R" Us, Inc.*, 906 F.2d 169, 173 (5th Cir. 1990)......................... 23

*Jenkins v. Henry C. Beck Co.*, 449 S.W.2d 454, 455 (Tex. 1969)...................................... 2, 3, 28

*KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.*, 988 S.W.2d 746, 749 (Tex. 1999)..... 30

*Loeffler v. Lytle ISD,* 211 S.W.3d 331, 350 (Tex. App.—San Antonio 2006, pet. denied) ......... 38

*Lopez v. RS Clark & Assocs.,* 396 S.W.3d 656, 657 (Tex. App.—Dallas 2013, no pet.)............. 38

*Love Terminal Partners, L.P. v. City of Dallas, Tex.,* 527 F. Supp. 2d 538, 555
(N.D. Tex. 2007) ................................................................................................................ 17

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 597 (1986)................... 11

*Murphy v. Campbell,* 964 S.W.2d 265, 273 (Tex. 1997)................................................................ 30

*Nat'l Athletic Trainers' Ass'n, Inc. v. Am. Physical Therapy Ass'n,* No. 3:08-CV-0158-G, 2008
WL 4146022, at *4 (N.D. Tex. Sept. 9, 2008) ............................................................. 2, 12, 17

*New York Party Shuttle, LLC v. Bilello,* 414 S.W.3d 206, 214 (Tex. App.—Houston [1st Dist.]
2013, pet. denied) ........................................................................................................... 2, 26

*Norris v. Hearst Trust,* 500 F.3d 454, 465 (5th Cir.2007)............................................................. 17

*Orthoflex, Inc. v. Thermotek, Inc.,* No. 3:10-CV-2618-D, 2011 WL 5879330, at *1 (N.D. Tex.
Nov. 23, 2011).................................................................................................................... 20

*Patel v. Midland Mem'l Hosp. & Med. Ctr.,* 298 F.3d 333, 346 (5th Cir.2002).......................... 17

*Peoples v. BAC Home Loans Servicing, LP,* 2011 WL 1107211, at *2-3 (N.D. Tex. Mar. 25,
2011)................................................................................................................................ 11, 12

*Provident Life & Acc. Ins. v. Knott,* 128 S.W.3d 211, 221-22 (Tex. 2003)................................ 30

*Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 161 (Tex. 1995)............ 34

*Ramsey v. Henderson,* 286 F.3d 264, 269 (5th Cir. 2002)............................................................ 12

*Richardson v. Allstate Texas Lloyd's,* 235 S.W.3d 863, 865 (Tex. App.—Dallas 2007, no pet.) 28

*RM Crowe Prop. Servs. Co., L.P. v. Strategic Energy, L.L.C.,* 348 S.W.3d 444, 448 (Tex. App.-
Dallas 2011, no pet.) ......................................................................................................... 2, 26

*Roy v. JPMorgan Chase Bank, N.A.,* No. 12-CV-2657, 2013 WL 164147, at *3 (S.D. Tex. Jan.
15, 2013) (emphasis added) ................................................................................................ 34

*Savitch v. Sw. Bell Yellow Pages, Inc.,* 2-04-257-CV, 2005 WL 1839092, at *4 (Tex. App.—Fort
Worth Aug. 4, 2005, no pet.)............................................................................................. 27

*Scalise v. McCallum,* 700 S.W.2d 682, 684 (Tex. App.-Dallas 1985, writ ref'd n.r.e.).............. 27

*Shasteen v. Mid-Continent Refrigerator Co.*, 517 S.W.2d 437 (Tex. Civ. App.-Dallas 1974, writ ref'd n.r.e.) ................................................................................................................. 25

*Sheline v. Dun & Bradstreet Corp.,* 948 F.2d 174, 176 (5th Cir. 1991) .................................... 12

*Slack v. Carpenter,* 7 F.3d 418, 419 (5th Cir. 1993) ......................................................... 3, 29

*Smith Int'l, Inc. v. Egle Grp., LLC,* 490 F.3d 380, 387 (5th Cir. 2007) ....................................... 2

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961) ........................................ 2, 13

*Thermacor Process, L.P. v. BASF Corp.*, 567 F.3d 736, 743 (5th Cir. 2009) ........................ 25, 34

*TIG Ins. Co. v. Aon Re, Inc.,* 521 F.3d 351, 355 (5th Cir. 2008) ............................................. 3, 30

*Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992) .................................................... 12

*Transport Indem. Co. v. Orgain, Bell & Tucker,* 846 S.W.2d 878, 882 (Tex. App.—Beaumont 1993, writ denied) ....................................................................................................... 38

*Vais Arms, Inc. v. Vais*, 383 F.3d 287, 295 (5th Cir. 2004) .................................................... 21

*Vallance & Co. v. Anda,* 595 S.W.2d 587, 590 (Tex. Civ. App.-San Antonio 1980, no writ) ..... 25

Vaught v. Showa Denko K.K., 107 F.3d 1137, 1141–42 (5th Cir. 1997) .................................... 30

*Vickery v. Vickery,* 999 S.W.2d 342, 356 (Tex. 1999)) ..................................................... 2, 26

*Walker v. U-Haul Co. of Mississippi,* 747 F.2d 1011, 1015 (5th Cir. 1984) .............................. 18

*Williams v. Upjohn Co.*, 153 F.R.D. 110, 113 (S.D. Tex. 1994) ......................................... 3, 29

## Statutes

Fed. R. Civ. P. 56(c) .................................................................................................. 11

Tex. Bus. & Com. Code § 15.50(a) ............................................................................ 21

*Tex.* Bus. & Com. Code § 17.565 ............................................................................. 30

Tex. Bus. & Com. Code §17.50(a) ............................................................................ 34

Tex. Bus. & Com. Code §17.50(c) ......................................................................... 38, 39

Tex. Bus. & Com.Code Ann. § 15.50(a) ..................................................................... 20

Tex. Bus. & Com.Code Ann. § 15.51(c), and (5) ...................................................... 2, 13

## PLAINTIFF DIGITAL RECOGNITION NETWORK, INC.'S BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Digital Recognition Network, Inc. ("DRN") files this Brief in Support of its Motion for Partial Summary Judgment (the "Motion"), seeking summary judgment against Defendants Accurate Adjustments, Inc. ("Accurate"), Coastline Recovery Services, Inc. ("Coastline"), After Hours Auto Recovery ("After Hours"), and Solid Solutions 24/7, Inc. ("Solid") (collectively, the "Defendants") on (1) Defendants' liability for breach of contract, (2) Defendants' counterclaims, and (3) DRN's affirmative defenses of novation, accord and satisfaction, limitations as to Defendants' Deceptive Trade Practices Act (the "DTPA") claim, and the contractual limitation of liability provision in the license agreements executed by Defendants. In support of its Motion, DRN respectfully shows the Court as follows:

## I.   SUMMARY OF DRN'S MOTION

Pursuant to Local Rule 56.3(a)(1), the following are the elements of each claim or affirmative defense as to which summary judgment is sought.

### A.   Sherman Act, section 2

The elements of a Sherman Act, section 2 action are as follows: (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Dimmitt Agric. Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d 516, 525 (5th Cir. 1982). Antitrust law establishes various other requirements: (1) an antitrust plaintiff must suffer an antitrust injury (and thus have standing), *see Commc'ns Integrated Sys., L.P. v. Lockheed Martin Corp.*, No. 3:07-CV-0341-B, 2008 WL 4391020, at *3 (N.D. Tex. Sept. 29, 2008), (2) an antitrust plaintiff's damages must flow from the anticompetitive conduct alleged, *see Nat'l Athletic Trainers' Ass'n, Inc. v. Am. Physical Therapy Ass'n*, No. 3:08-CV-

0158-G, 2008 WL 4146022, at *4 (N.D. Tex. Sept. 9, 2008), (3) the competition foreclosed by a noncompete must constitute a substantial share of the relevant market, *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961) (analyzing Clayton Act), (4) mandatory reformation of an overbroad noncompete clause remedies any anticompetitive effect, *see* TEX. BUS. & COM.CODE ANN. § 15.51(c), and (5) noncompete clauses are enforceable when they are reasonable and ancillary to a valid agreement, *see Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 566 (S.D. Tex. 2014), appeal dismissed (Sept. 11, 2014).

**B.    Breach of Contract**

The elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Baker v. Great N. Energy, Inc.*, No. 3:14-CV-0240-B, 2014 WL 6805483, at *3 (N.D. Tex. Dec. 3, 2014) (citing *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir. 2007)).

**C.    Novation**

To establish a novation, the party raising the defense must prove: (1) the existence of a previous, valid obligation; (2) a mutual agreement of the parties to a new contract; (3) the extinguishment of the old contract; and (4) the validity of the new contract. *New York Party Shuttle, LLC v. Bilello*, 414 S.W.3d 206, 214 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (citing *RM Crowe Prop. Servs. Co., L.P. v. Strategic Energy, L.L.C.*, 348 S.W.3d 444, 448 (Tex. App.-Dallas 2011, no pet.); *Vickery v. Vickery,* 999 S.W.2d 342, 356 (Tex. 1999)).

**D.    Accord and Satisfaction**

An "accord" of an accord and satisfaction is a new contract to discharge an existing obligation. *Honeycutt v. Billingsley*, 992 S.W.2d 570, 576-77 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (citing *Jenkins v. Henry C. Beck Co.,* 449 S.W.2d 454, 455 (Tex. 1969);

*Bueckner v. Hamel,* 886 S.W.2d 368, 372 (Tex. App.—Houston [1st Dist.] 1994, writ denied)).

"Satisfaction" is the performance of the new contract. *City of Houston v. First City,* 827 S.W.2d

462, 472 (Tex. App.—Houston [1st Dist.] 1992, writ denied). In the new contract: (1) the parties

agree to discharge the existing obligation; (2) the parties agree that one party will perform and

the other will accept something different from what each expected from the existing obligation;

(3) the parties unmistakably communicate that the different performance will discharge the

existing obligation; (4) the agreement to discharge the existing obligation is plain, definite,

certain, clear, full, explicit, and not susceptible of any other interpretation; and (5) the parties'

agreement must be accompanied by acts and declarations that the creditor is "bound to

understand." *Jenkins v. Henry C. Beck Co.,* 449 S.W.2d at 455.

## E.   Limitations

Although Texas law must be consulted to determine the applicable limitations periods,

federal law determines when a cause of action accrues. *Williams v. Upjohn Co.,* 153 F.R.D. 110,

113 (S.D. Tex. 1994) (citing *Slack v. Carpenter,* 7 F.3d 418, 419 (5th Cir. 1993); *Gartrell v.

Gaylor,* 981 F.2d 254, 257 (5th Cir. 1993)). A cause of action accrues when a wrongful act

causes some legal injury, even if the fact of injury is not discovered until later, and even if all

resulting damages have not yet occurred. *TIG Ins. Co. v. Aon Re, Inc.,* 521 F.3d 351, 355 (5th

Cir. 2008). A cause of action generally accrues, and the statute of limitations begins to run,

when facts come into existence that authorize a claimant to seek a judicial remedy. *Id.* The

statute of limitations, therefore, begins to run when the plaintiff is in possession of the critical

facts that he has been injured. *Bayou Bend Towers Council of Co. Owners v. Manhattan Constr.

Co.,* 866 S.W.2d 740, 742 (Tex. App.—Houston [14th Dist.] 1993, writ denied). A party need

only be aware of enough facts to apprise him of his right to seek a judicial remedy. *Id.*

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.   DRN's Role in the Auto Finance Industry.**

DRN uses proprietary license plate recognition ("LPR")[1] technology to assist lenders and other clients in the repossession industry in locating and repossessing vehicles.  As explained in greater detail below, DRN's clients provide DRN with lists of vehicles sought for repossession (such lists are commonly referred to as "hot lists"), and DRN uses its proprietary technology to compare the hot lists with photographs of license plates and other LPR Data gathered by DRN's network of repossession companies (including Defendants) who enter into license agreements with DRN and are generally referred to as "DRN Affiliates."  When DRN obtains a "hit" – a match between a vehicle on the hot list and a license plate scanned by a DRN Affiliate – the client is able to use that information to have the vehicle repossessed.  DRN's clients generally pay a fee to DRN for access to the data, and a repossession fee to the company that actually recovers the car.  In addition, DRN shares a portion of the revenue it receives for the data with the DRN Affiliates who collected the data.

**B.   The License Agreements Executed By Defendants**

Each Defendant executed a License Agreement with DRN on or about March 27, 2014, which replaced earlier Affiliate Agreements that each Defendant had with DRN.  As acknowledged by Defendants, the terms of the License Agreements were negotiated and Defendants made revisions to them, and each License Agreement contains an integration clause stating:

> This Agreement supersedes all prior agreements, whether written, not oral, between the parties with respect to its subject matter and constitutes (along with any documents delivered pursuant to this Agreement) a complete and exclusive

---

[1]  LPR is sometimes referred to as "automatic license plate recognition" or "automatic license plate reader" or "ALPR."  As used herein, the terms LPR and ALPR are interchangeable.

statement of the terms of the agreement between the parties with respect to its subject matter.[2]

(Fornaro at ¶65, Exs. 2-D and 2-E at §17(e) (App. 110, 168 and 193); Freitas at ¶65, Ex. 1-F at §17(e) (App. 015 and 086); Englebrecht at ¶56, Ex. 3-C at §17(e) (App. 216 and 267)).

Defendant Accurate first became a DRN Affiliate on or about March 23, 2010 when it executed an Affiliate Agreement with DRN. At that time, Accurate purchased its first DRN Kit, and currently owns nine DRN Kits. (Freitas at ¶¶36-37 (App. 008)). After terminating its first Affiliate Agreement, Accurate executed a second Affiliate Agreement with DRN in approximately April, 2011 (*Id.* at App. 008)), which was then replaced by the License Agreement executed on or about March 27, 2014. (Freitas at ¶64).

Defendant Coastline became a DRN Affiliate in July 2010, and it first purchased an LPR Kit from DRN at that time. (Fornaro at ¶20 (App. 098)). Currently, Coastline owns nineteen DRN Kits. (*Id.* at App. 098). Coastline's Affiliate Agreement was replaced by the License Agreement executed on or about March 27, 2014. (Fornaro at ¶63).

After Hours first purchased a DRN Kit in August 2011, and it executed an Affiliate Agreement at that time. (Englebrecht at ¶17 (App. 205)). Over the subsequent three (3) years, After Hours purchased seven additional kits, for a total of eight DRN Kits. (*Id.* at App. 205). After Hours' Affiliate Agreement was replaced by the License Agreement executed on or about March 27, 2014. (Englebrecht at ¶54).

Solid became a DRN Affiliate when it executed an Affiliate Agreement in April 2013, at which time it purchased its first DRN Kit. (Fornaro at ¶41 (App. 104)). Solid currently owns

---

[2] A similar integration clause is set out in Section 7.19 of Defendants' Affiliate Agreements filed in the Appendix to Defendants' Counterclaim. (Dkt. No. 53 at App. 287 (Accurate), App. 298 (Accurate), App. 311 (Coastline), App. 321 (Coastline), App. 333 (After Hours), App. 344 (Solid). Section 8 of Defendants' Sales Agreements also sets out an integration clause. *See* App. 276-277 (Accurate), App. 289-290 (Accurate), App. 301-302 (Coastline), App. 325-326 (After Hours)).

twenty-two (22) DRN Kits.   (*Id.* at ¶44 (App. 105)).   As with the other Defendants, Solid's Affiliate Agreement was replaced by the License Agreement executed on or about March 27, 2014. (Fornaro at ¶63).

## C.   The DRN System.

Under the License Agreements, each Defendant was licensed to use the DRN System, which is defined in the License Agreements to include, among other things, the DRN Car Detector software, DRN WebRepo, and all other equipment, software, hardware, materials and information provided by DRN to Defendant pursuant to the License Agreement, including all enhancements, upgrades, improvements, changes, modifications, revisions or derivative works made to same from time to time. Ex. 17-A at §1, p. 2. The License Agreements executed by the Defendants in March 2014 grant each Defendant a non-exclusive, non-transferable license to access the DRN System solely in accordance with the terms of the Agreement. (Hodnett at ¶11 (App. 489)). The License Agreements executed by Defendants also set forth the authorized uses of the DRN System by Defendants, and prohibit other uses of the system not allowed under the terms of the Agreement. (*Id.* (App. 489-90)).

Under the License Agreements, each DRN Affiliate, including Defendants, was required to purchase at least one LPR Kit from DRN[3] and to use commercially reasonable efforts to scan a minimum of 10,000 license plates per month with the LPR Kit(s) and to transmit the associated LPR Data to DRN. (Ex. 17-A at §3, pp. 5-6 (App. 458-459)).

An "LPR Kit" is defined in the License Agreement to mean "a package of electronic hardware consisting of not less than one (1) camera, one (1) digital signal processor, camera

---

[3]  An LPR Kit purchased from DRN is sometimes referred to as a "DRN Kit." Additionally, the LPR Kits are at times referred to as "LPR Systems" or "ALPR Systems," which as explained above, are *not* the same thing as the "DRN System" as defined in the License Agreements.

cables, [an] Ethernet cable, [a] power harness and a GPS device, as specified by DRN." (Ex. 17-A at §1, p. 3 (App. 456)). The LPR Kits are typically mounted on tow trucks or other vehicles owned by the DRN Affiliates. Once installed, the LPR Kits automatically photograph every license plate the vehicle passes during its daily routine of driving on the public streets. (Hodnett, at ¶4, (App. 487)). In addition to photographing license plates, the LPR Kits collect metadata including the date and time the photograph was taken and the GPS coordinates of the camera at the time the photograph was taken. Collectively, these photographs and metadata are referred to as "LPR Data" and are defined as such in the License Agreements executed by Defendants. (*Id.* at ¶5 (App. 487))

"DRN Car Detector" (also known as "CarDetector Mobile" or "CDM") is the software which controls and operates the LPR Kit(s) and which aggregates, sorts and communicates LPR Data gathered by the DRN Affiliates with their LPR Kits. (Baggett at Ex. 17-A at §1, p. 2). The proprietary Car Detector software is licensed to the DRN Affiliates as part of the DRN System and resides on an in-car laptop computer connected to the LPR Kits. (*Id.* (App. 455)).

"DRN WebRepo" is the software code, services and databases on the DRN server that collect, store, communicate, process and disseminate LPR Data gathered by DRN Affiliates. (*Id.* (App. 455)). After LPR Data is gathered by the DRN Affiliates using an LPR Kit and the Car Detector software, it is temporarily stored in a password-protected Car Detector database on the laptop (Whitfield at ¶13 (App. 505)) before being automatically uploaded to DRN WebRepo, where it is stored in a password-protected database in a secure data center located in Dallas, Texas. (Hodnett, at ¶5, (App. 487)).

Section 2(d) of the License Agreement specifically prohibits Defendants as follows:

**Restrictions on Use of DRN System.** Except as expressly permitted under this Agreement, DRN Affiliate agrees that it shall not, nor permit a Related Party or

any other party to, without the prior written consent of DRN . . . (v) make, retain, and distribute copies of LPR Data or Hits, including, without limitation, through data retention using storage drives, splitters, or other such devices.

(Ex. 17-A at §2(d), p. 5 (App. 458)).

The License Agreements executed by the Defendants clearly and unequivocally establish that DRN owns all LPR Data, the DRN System, and DRN Intellectual Property and (ii) nothing in the agreement shall be deemed to convey to Defendants or to any other party any ownership interest in or to the LPR Data, the DRN System or the DRN Intellectual Property. (*Id.* at §2(c), p. 4 (App. 457)).

In addition to clearly establishing the license and uses granted to Defendants, the License Agreements define the term "Confidential Information" and set forth the guidelines for each Defendant's access to, and permitted uses of, DRN's Confidential Information. (*Id.* at §1 at p. 1. and §11(c)(3) (App. 454)). The term Confidential Information includes, but is not limited to trade secrets, the DRN System, LPR Data, "Hits," and the DRN Intellectual Property. (*Id.*). Importantly, the License Agreements clearly delineate Defendants' restrictions related to the use, disclosure, or reproduction of the Confidential Information of Plaintiff. (*Id.* at §11(c)(3) (App. 464-465)). Specifically, Section 11(c)(3) sets forth the following identical restriction language in each of the four License Agreements executed by Defendants:

> **Restrictions.** As a result of the sensitive nature of the Confidential Information, DRN Affiliate agrees, except as otherwise permitted by this Agreement: … (ii) not to copy or reproduce any portion of the Confidential Information; (iii) not to… use or otherwise exploit the Confidential Information in any way.

(*Id.* (App. 464)).

Section 11(c)(5) of the License Agreement requires Defendants to destroy all Confidential Information and certify in writing that the Defendants have done so, upon termination. (*Id.* at §11(c)(5) App. (464)).

**D.   Defendants Use The Sync Tool To Make And Retain Copies Of LPR Data.**

In mid-2012, Coastline, Accurate and After Hours developed a tool to retain ALPR data collected through their DRN Systems on their local servers (the "Sync Tool"). (Englebrecht at ¶36 (App. 212); Fornaro at ¶45 (App. 105); Freitas at ¶45 (App. 011)). They created the Sync Tool to maintain and access the ALPR data they had collected to complete and/or obtain new Assignments. (*Id.* (App. 212, App. 105 and App. 011)). Solid began using the Sync Tool in April 2013. (Fornaro at ¶46 (App. 106); Freitas at ¶46 (App. 011); Englebrecht at ¶37 (App. 212)). Defendants have used the Sync Tool to transmit a copy of the ALPR data to their own server, which they have accessed through web portals. (Fornaro at ¶47 (App. 106); Freitas at ¶48 (App. 012); Englebrecht at ¶38 (App. 212)).

Defendants use the Sync Tool to share the LPR Data they collect with their DRN Kits with each other. (Freitas at ¶48 (App. 012); Fornaro at ¶47 (App. 106); Englebrecht at ¶38 (App. 212). For a time, Defendants also shared the LPR Data they collected with another DRN Affiliate, Four Star Recovery, Inc. (Chapman at ¶¶5, 7 (App. 512); Barker at ¶11(App. 500)).

**E.   Defendants Continue to Use DRN Car Detector Software Post-Termination.**

On August 25, 2014 DRN provided notice to Defendants that they were in breach of the License Agreements. (Fornaro at ¶66 (App. 110); Englebrecht at ¶57 (App. 216-17); (Freitas at ¶66 (App. 016)). On August 19, 2014 DRN terminated its relationship with Defendants. (Fornaro at ¶70 (App. 111); Englebrecht at ¶60 (App. 217); Freitas at ¶69 (App. 016)). After the License Agreements were terminated, Defendants have continued to use the DRN Kits, the Car Detector software, and the Sync Tool to gather LPR Data for their own assignments. (Fornaro at ¶75 (App. 111-12); Englebrecht at ¶62 (App. 217); Freitas at ¶71 (App. 016-17); Barker at ¶12 (App. 500)).

F.    **DRN Files This Lawsuit And Defendants File A Counterclaim.**

Given that the Defendants, among other things, breached the License Agreement and misappropriated DRN's trade secrets, DRN filed a lawsuit in the 348th Judicial District of Tarrant County, Texas on October 29, 2014. (Dkt. No. 1-1). The District Court issued a Temporary Restraining Order on the same date. (Dkt. No. 1-1). On November 6, 2014, Defendants removed the case to this Court based on diversity. (Dkt. No. 1). On November 24, 2014, DRN filed Plaintiff's Amended Complaint. (Dkt. No. 12). On December 29, 2014, Defendants filed their Rule 12(b)(6) Motion to Dismiss Plaintiff's Amended Complaint. (Dkt. No. 16). After full briefing, the Court denied Defendants' motion to dismiss. (Dkt. No. 35). Defendants filed an answer and "countercomplaint" to Plaintiff's Amended Complaint asserting the following causes of action: violation of section 2 of the Sherman Act, violation of Section 1 of the Sherman Act, fraud in the inducement, breach of contract, tortious interference with prospective business relationships, declaratory judgment, promissory estoppel, and violations of the DTPA. (Dkt. No. 52). DRN filed a Motion to Dismiss Defendants' Counterclaim, which was fully briefed by the parties. (Dkt. Nos. 58 and 63). The Court granted the motion to dismiss in part by dismissing Defendants' violation of section 1 of the Sherman Act, fraud in the inducement, tortious interference with prospective business relationships, declaratory judgment, and promissory estoppel. (Dkt. No. 65). As such, Defendants' only remaining claims against DRN are for violation of section 2 of the Sherman Act, breach of contract and violations of the DTPA. (*Id*). DRN filed an answer to Defendants' Counterclaim and asserted numerous affirmative defenses, including, but not limited to, statute of limitations, novation, accord and satisfaction and contractual limitation of liability as set forth in the License Agreement. (Dkt. No. 66).

For all the reasons stated below, DRN now moves for partial summary judgment on Defendants' counterclaims of violation of section 2 of the Sherman Act, breach of contract and

violations of the DTPA.  DRN also asks the Court to grant summary judgment on liability as to

DRN's breach of contract claim against Defendants.

## III.   ARGUMENT AND AUTHORITIES

### A.   Summary Judgment Standard.

Summary judgment is proper when there is no genuine issue as to any material fact and

the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  A movant who

bears the burden of proof at trial must establish "beyond peradventure all of the essential

elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780

F.2d 1190, 1194 (5th Cir. 1986).  Summary judgment is proper when the record shows that there

are no genuine issues of material fact and that the movant is entitled to judgment as a matter of

law.  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Baton Rouge Oil*

*& Chem. Workers Un. v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).  The movant can

discharge its burden by pointing out the absence of evidence supporting one or more essential

elements of the nonmoving party's claim, "since a complete failure of proof concerning an

essential element of the nonmoving party's case necessarily renders all other facts immaterial."

*Peoples v. BAC Home Loans Servicing, LP,* 2011 WL 1107211, at *2-3 (N.D. Tex. Mar. 25,

2011) (citing *Celotex,* 477 U.S. at 323).

Once the movant has carried its burden under Rule 56(a), the nonmoving party must

identify evidence in the record that creates a genuine dispute as to each of the challenged

elements of its case. *Peoples*, 2011 WL 1107211, at *3.  If the evidence identified could not lead

a rational trier of fact to find in favor of the nonmoving party as to each essential element of the

nonmoving party's case, there is no genuine dispute for trial and summary judgment is

appropriate. *Peoples,* 2011 WL 1107211, at *3 (citing *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587, 597 (1986). "[C]onclusory allegations, speculation, and

unsubstantiated assertions are inadequate to satisfy the nonmovant's burden" in response to a motion for summary judgment. *Peoples*, 2011 WL 1107211, at *3 (citing *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (internal quotation marks omitted)). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Peoples*, 2011 WL 1107211, at *3 (citing *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992)).

Summary judgment is particularly appropriate where the unresolved issues are primarily legal rather than factual. *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991); *Bumstead v. Jasper Cnty.*, 931 F.Supp 1323, 1328 (E.D.Tex. 1996). If there are no fact issues about when limitations began to run, the defense of limitations is appropriate for summary judgment. *Sheline v. Dun & Bradstreet Corp.*, 948 F.2d at 176; *Bumstead v. Jasper Cnty.*, 931 F.Supp at 1328.

## B.   DRN Is Entitled To Summary Judgment On Defendants' Antitrust Claim.

### 1.   The Alleged Facts Do Not Support An Antitrust Claim.

The elements of a Sherman Act, section 2 action are as follows: (1) the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Dimmitt Agric. Indus., Inc. v. CPC Int'l Inc.*, 679 F.2d at 525. Antitrust law establishes various other requirements: (1) an antitrust plaintiff must suffer an antitrust injury (and thus have standing), *see Commc'ns Integrated Sys., L.P. v. Lockheed Martin Corp.*, 2008 WL 4391020, at *3 (N.D. Tex. Sept. 29, 2008), (2) an antitrust plaintiff's damages must flow from the anticompetitive conduct, *see Nat'l Athletic Trainers' Ass'n, Inc. v. Am. Physical Therapy Ass'n*, No. CIV A 3:08-CV-0158-G, 2008 WL 4146022, at *4 (N.D. Tex. Sept. 9, 2008), (3) the competition foreclosed by a noncompete must constitute a substantial

share of the relevant market, *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 328 (1961) (analyzing Clayton Act), (4) mandatory reformation of an overbroad noncompete clause remedies any anticompetitive effect, *see* TEX. BUS. & COM.CODE ANN. § 15.51(c), and (5) noncompete clauses are enforceable when they are reasonable and ancillary to a valid agreement, *see Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 566 (S.D. Tex. 2014), appeal dismissed (Sept. 11, 2014). Defendants' Sherman Act, section 2 claim should be dismissed because (1) Defendants did not suffer an antitrust injury (and thus lack standing), (2) Defendants cannot show damages flowing from anticompetitive conduct, (3) the competition foreclosed by the noncompetes does not constitute a substantial share of the relevant market, (4) mandatory reformation of an overbroad noncompete clause remedies any anticompetitive effect, and (5) the noncompete clauses are enforceable because they are reasonable and ancillary to a valid agreement. Defendants' judicial admissions and testimony negate their Sherman Act, section 2 claim as a matter of law.

As to the alleged relevant market, Defendants allege DRN "has been the first and dominant provider of goods and services in the Automotive License Plate Technology Market ('ALPR Technology') Market." (Dkt. No. 52 at ¶1). Defendants state ALPR consists of a system and describe ALPR software and hardware technology. (*Id.* at ¶8). The counterclaim goes on to state consumers of ALPR Technology purchase or lease ALPR Systems. (*Id.*).

Defendants admit "there are many ALPR Providers offering ALPR Systems to Agents across the United States." (Freitas at ¶24 (App. 005)). Defendants admit DRN competitors in the alleged relevant market "include, among others, 3M, ELSAG North America, and MVTrac." (Freitas at ¶25 (App. 005)). Defendants state they have desired to sever their relationships with DRN and switch to a different ALPR Service Provider. (Freitas at ¶44 (App. 010-011);

Englebrecht at ¶35 (App. 211); Fornaro at ¶39 (App. 103-104)).  Accurate leaves out that it returned its DRN equipment for a refund when Accurate terminated its relationship with DRN in November 2010 only to return as a DRN affiliate months later.  (Baggett at ¶2 (Ex. A-2 App. 479)).  Defendants also fail to admit Accurate determined that, compared to other alternatives, DRN offers superior value.  (Baggett at ¶2 (Ex. 17-C (App. 483)) (touting benefits of DRN products and services over competitors' products and services).  Freitas' statements and actions undermine each Defendant's claim.

Defendants go on to assert that Accurate and other DRN Affiliates did not terminate their respective contractual relationships with DRN "because the Affiliate Agreement that most Affiliates, including Accurate, executed contain provisions at sections 5.1(a), 5.1(b), and 7.7 prohibiting Affiliates, during the term of the agreement and for one year thereafter, from using or working with any competitor of DRN's or otherwise utilizing ALPR technology under penalty of substantial liquidated damages." (Freitas at ¶44 (App. 010-011); Englebrecht at ¶35 (App. 211); Fornaro at ¶39 (App. 103-104)).  Defendants further state that Defendants and other DRN Affiliates did not switch to a different ALPR Service Provider because that would have caused them to forfeit the substantial investment required to purchase and operate DRN Kits. (Freitas at ¶44 (App. 010-011); Englebrecht at ¶35 (App. 211); Fornaro at ¶39 (App. 103-104)).

Defendants admit that "In approximately mid-2012 . . .  Accurate, together with [Coastline and After Hours] developed a tool to retain ALPR Data collected through their DRN Kits on their own local servers (the "Sync Tool")." (Freitas at ¶45 (App. 011); Englebrecht at ¶36 (App. 212); Fornaro at ¶45 (App. 105-106)).  Accurate represents to the Court that this action was allowed under the earlier agreements, despite the agreements' confidentiality

provisions. Accurate, however, knew such actions were not permitted, and even stated in May 2011, after terminating his first agreement with DRN, as follows:

> DRN never... I will repeat, NEVER advised me we own our own data, in fact quite the opposite. I am fully aware DRN owns the data (under contract), however I have access to it for my personal use on my own assignments. I never understood that I own the data.

(Baggett at ¶2 (Ex. 17-C (App. 483)).

Defendants state they have never and do not in the future intend to sell the ALPR Data collected with their DRN Kits to third parties or otherwise use this ALPR Data for any purpose other than to complete Assignments they receive directly from clients. (Freitas at ¶52 (App. 012); Englebrecht at ¶42 (App. 213); Fornaro at ¶51 (App. 107)). Yet, Defendants were accessing and using LPR technology and data to recover vehicles for the financing and lending industry, in violation of their obligations to DRN. (Hodnett at ¶21-25 (App. 492-494); Barker at ¶4-9, 12, (App. 499-500); Whitfield at ¶31 (App. 509-510); Chapman at ¶7, 9 (App. 512-513); Scoles at ¶8, 9 (App. 514-15)). And, several individuals have confirmed Defendants used the data for purposes other than completing their direct assignments. *Id.*

Defendants also complain that the 2014 License Agreement also included a new noncompete stating that, during the term of the agreement and for twelve months thereafter, the DRN Affiliate shall not:

> directly or indirectly, engage or invest in, own, manage, operate, finance, control or participate in the ownership, management, operation, financing or control of, be employed by, associated with or in any manner connected with, or render services or advice or other aid to, or guarantee any obligation of, any person or entity engaged in or planning to become engaged in the business of using [ALPR] technology and [ALPR] data for the purpose of recovering vehicles sought for recovery within the financial, lending or insurance industries or assisting in debt collection efforts on behalf of municipalities and governmental entities.

(Freitas at ¶58 (App. 014); Englebrecht at ¶48 (App. 214-215); Fornaro at ¶57 (App. 108)).

Defendants argue that the complained-of contract provisions are not traditional "covenants not to compete" because they do not simply restrict post-termination competition with DRN. (Dkt. No. 52 at ¶37). Defendants state, "Rather, and in addition, they restrict former DRN Affiliates from becoming a consumer of any DRN-competitor offering alternative ALPR Systems that may be superior to and/or cheaper than those offered by DRN." (*Id.*). In reality, the noncompetes serve a legitimate business purpose: DRN promised to provide Defendants with access to confidential information in exchange for Defendants' promise not to compete, and did provide such access. (Fornaro at ¶65, Exs. 2-D and 2-E at §2(d), 17(d) and 17(f) (App. 110, 162-163, 187-188); Freitas at ¶65, Ex. 1-F at §2(d), 17(d) and 17(f) (App. 015, 074, 085, and 086); Englebrecht at ¶56, Ex. 3-C at §2(d), 17(d) and 17(f) (App. 216, 255, and 267)). Freitas admitted the clauses serve a reasonable business purpose when he stated as follows:

> I would assume DRN does not want those running MVTrack [DRN's competitor] to also run their cameras or more importantly have access to the DRN system. A DRN affiliate could basically use their DRN credentials to "steal" assignments from DRN LPR 2.0 clients or other DRN affiliates. It's factual. No I won't give details as to how, but it is possible.

(Baggett at ¶2 (Ex. 17-C (App. 483)).

DRN's summary judgment motion should be granted because Defendants' allegations and evidence bar an antitrust claim and the antitrust claim is not supported by competent evidence.

2.    Defendants Cannot Demonstrate An Antitrust Injury.

Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) (internal quotation marks omitted). Absent such boundaries, the potent private enforcement tool that is an action for treble damages could be a disservice to the purpose of the antitrust laws: to protect competition. *See*

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 75 (2d Cir. 2013). Antitrust injury is a component of standing to bring claims under sections 1 and 2 of the Sherman Act. *L-3 Commc'ns Integrated Sys., L.P. v. Lockheed Martin Corp.*, No. CIVA 3 07-CV-0341-B, 2008 WL 4391020, at *3 (N.D. Tex. Sept. 29, 2008) (citing *Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1185 (5th Cir.1988)).

To have standing to assert an antitrust claim, the plaintiff must establish an injury caused by the defendant and an antitrust injury. *See Nat'l Athletic Trainers' Ass'n, Inc. v. Am. Physical Therapy Ass'n*, No. 3:08-CV-0158-G, 2008 WL 4146022, at *4 (N.D. Tex. Sept. 9, 2008) (*citing Norris v. Hearst Trust*, 500 F.3d 454, 465 (5th Cir.2007)). Antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' conduct unlawful." *Id.* (*citing Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Love Terminal Partners, L.P. v. City of Dallas, Tex.*, 527 F. Supp. 2d 538, 555 (N.D. Tex. 2007) (*citing Patel v. Midland Mem'l Hosp. & Med. Ctr.*, 298 F.3d 333, 346 (5th Cir.2002) (dismissing plaintiff's antitrust claim because defendant's conduct, although harmful to plaintiff, did not eliminate plaintiff as competitor)).

Defendant Freitas admitted facts showing that the market has not suffered any anticompetitive effects based on DRN's actions. He stated as follows in May 2011:

> DRN equipment may not be completely up to PAR with MVTrack provided equipment, however price is definitely a reason. Things are currently happening to address this issue. Most people cannot, nor will not, pay 3, 4 or 5 years for equipment that will more than likely be outdated in a year or so. There are many, MANY options with DRN that MVTrack won't even consider.

(Baggett at ¶2(Ex. 17-C (App. 483)).

Freitas' statements prove any alleged wrongdoing by DRN did not cause antitrust injury.

Further, Defendants allege that the noncompete clauses at issue "restrict former DRN Affiliates from becoming a consumer of any DRN-competitor offering alternative ALPR Systems that **may be** superior to and/or cheaper than those offered by DRN." (Dkt. No. 52 at ¶37) (emphasis added). These allegations by Defendants show they do not affirmatively allege any conduct by DRN that affected price, market innovation or other measures of market competition. Defendants cannot take up any standing of DRN's competitors to complain about the prohibition on competitor product clause in the absence of any antitrust injury to Defendants. Accordingly, Defendants have no evidence to support they suffered an antitrust injury.

3.    Defendants Cannot Show Damages Flowing from any Alleged Anticompetitive Act.

Defendants' Sherman Act, section 2 claim should be dismissed because Defendants cannot show damages flowing from anticompetitive conduct. Defendants allege that the noncompete clauses at issue "restrict former DRN Affiliates from becoming a consumer of any DRN-competitor offering alternative ALPR Systems that **may be** superior to and/or cheaper than those offered by DRN." (Dkt. No. 52 at ¶37) (emphasis added). Defendants make no allegations about comparative pricing or similar damages incurred by Defendants. Allegations that DRN's actions restrict parties from using competitor products that may be superior or less expensive, without any demonstrable evidence of an effect on price or any other indicator of anticompetitive effect are insufficient to support that Defendants incurred damages from any alleged anticompetitive act of DRN. (*Id.*). Any complaints by Defendants about allegedly being put out of business go to individualized injury stemming from the contracts between DRN and the respective Defendants. These alleged damages do not flow from any acts recognized as actionably anticompetitive. *See Walker v. U-Haul Co. of Mississippi*, 747 F.2d 1011, 1015 (5th Cir. 1984) (injury to business must flow from the presumed anticompetitive effects resulting

from alleged monopolist's alleged monopolization).  Here, Defendants appear to allege they are foreclosed from competing and are thus injured, not that DRN's competitors are foreclosed from competing.  The injury, therefore, does not flow from any recognized anticompetitive effect.  *See* Countercl. ¶115 (dkt 52) ("the costs to the Companies and other Affiliates of switching from DRN's ALPR Systems to ALPR Systems offered by a DRN Competitor were so high as to deter and prevent competition in the relevant market").  Accordingly, Defendants have no evidence to support they suffered damages flowing from any allegedly anticompetitive act.  Any allegations that the noncompetes had anticompetitive effects on the alleged relevant market are not supported by competent evidence.

   4.   The Noncompetes Do Not Foreclose A Substantial Share Of Competition.

   Defendants' Sherman Act, section 2 claim should be dismissed because noncompete clauses limiting use of competitor products are not per se anticompetitive and the required finding to support an antitrust claim is that such agreements foreclose a substantial share of competition in the relevant market.  The limited one-year prohibition against using competitor products is akin to an exclusive dealing agreement in terms of effect on competitors.  Authority analyzing the market effect of such agreements is, therefore, helpful here.  To the extent Defendants complain of the noncompetes' alleged effects on Defendants, such individual and particularized injury does not support an antitrust claim.  As such, DRN's argument focuses on the alleged relevant market and not any injury unique to Defendants.

   Competition foreclosed by a contract must be found to constitute a substantial share of the relevant market to support an antitrust claim.  *Tampa Elec.,* 365 U.S. at 328.[4]  Stated differently, the opportunities for competitors to enter into or remain in the relevant market must

---

[4] The court noted absence of substantial share under the Clayton Act foreclosed the antitrust plaintiff's Sherman Act, section 2 claim. *Tampa Elec.,* 365 U.S. at 328.

be significantly limited. *Id.* Here, Defendants allege only that DRN's actions restrict parties from using competitor products that may be superior or less expensive, without any allegations of an effect on price or competition. (Dkt. No. 52 at ¶37). Defendants do not allege the opportunities for competitors are significantly limited and merely focus on the particularized effect on Defendants. Such theory, on its face, cannot support that the opportunities for competitors to enter into or remain in the alleged relevant market are significantly limited by the noncompete clauses or any other DRN actions. DRN's summary judgment, therefore, should be granted.

     5.    <u>Mandatory Reformation Bars Defendants' Antitrust Claim.</u>

Defendants' Sherman Act, section 2 claim should be dismissed because mandatory reformation of an overbroad noncompete clause remedies any anticompetitive effect. To the extent the Court finds the noncompete clause unenforceable as written due to any alleged anticompetitive effects, reformation is the appropriate remedy under Texas law, which is the law governing the agreements at issue. (Fornaro at ¶65, Exs. 2-D and 2-E at §17(b) (App. 110, 167, and 192); Freitas at ¶65, Ex. 1-F at §17(b) (App. 015 and 085); Englebrecht at ¶56, Ex. 3-C at §17(b) (App. 216 and 266)). Under Texas law, a covenant not to compete is enforceable to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee. TEX. BUS. & COM.CODE ANN. § 15.50(a). If the covenant is not enforceable under § 15.50(a), "the court shall reform the covenant to the extent necessary to cause the limitations contained in the covenant as to time, geographical area, and scope of activity to be restrained to be reasonable." § 15.51(c); *Orthoflex, Inc. v. Thermotek, Inc.*, No. 3:10-CV-2618-D, 2011 WL 5879330, at *1 (N.D. Tex. Nov. 23, 2011). Defendants' theory based on the noncompete clause, therefore, is groundless because a

court, under Texas law, must reform an overbroad noncompete to comply with the law, which is Defendants' appropriate remedy for the injury alleged. The mandatory reformation remedy defeats any claim that the clause has an anticompetitive effect.

6.   The Noncompetes are Reasonable and Ancillary to Valid Contracts.

Defendants' Sherman Act, section 2 claim should be dismissed because the noncompete clauses at issue (1) are ancillary to an otherwise valid agreement and (2) have a legitimate business purpose. Under Texas law, "[a]n agreement not to compete is in restraint of trade and therefore unenforceable on grounds of public policy unless it is reasonable." *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681 (Tex. 1990). Whether a covenant not to compete is reasonable presents a question of law. *See Vais Arms, Inc. v. Vais*, 383 F.3d 287, 295 (5th Cir. 2004). Under the Texas Business and Commerce Code, Section 15.50(a), a covenant not to compete is enforceable to the extent that it (1) is ancillary to an otherwise enforceable agreement; and (2) contains reasonable limitations as to duration, geographic area, and scope of activity that impose no greater restraint than is necessary to protect the goodwill or other business interest of the promisee. TEX. BUS. & COM. CODE § 15.50(a); *see also Guy Carpenter & Co., Inc. v. Provenzale*, 334 F.3d 459, 465 (5th Cir. 2003).

Here, the 2014 License Agreement, and all preceding agreements, were valid agreements and the noncompetes were ancillary to the agreements because DRN promised to provide Defendants with access to confidential information in exchange for Defendants' promise not to compete, and did provide such access. *See Daily Instruments Corp. v. Heidt*, 998 F. Supp. 2d 553, 566 (S.D. Tex. 2014), appeal dism'd, Case No. 14-20388 (5th Cir. Sept. 11, 2014) (employee's covenant not to compete was ancillary to otherwise enforceable agreement because employer promised to provide employee with access to confidential information in exchange for employee's promise not to compete, and did provide such access). Further, the provisions

contain reasonable limitations as to duration, geographic area, and scope of activity that impose no greater restraint than is necessary to protect the goodwill or other business interest of DRN. Defendants had access to DRN's confidential information regarding its clients and sales, including DRN's customers, sales strategies, product and process improvements, customer lists, pricing, and other data. (Hodnett at ¶¶11, 13, 18-19 (App. 489-492)).  The limitations contained in the DRN noncompete provisions are reasonable and not greater than necessary given the type of confidential information to which DRN provided Defendants access. *See Daily Instruments*, 998 F. Supp. 2d at 568.  DRN, therefore, respectfully requests that the Court grant its summary judgment motion as to Defendants' Sherman Act, section 2 claim.

**C.   DRN Is Entitled To Summary Judgment On Defendants' Breach Of Contract Claim.**

    1.   <u>Defendants Cannot Meet The Elements Of A Breach Of Contract Claim.</u>

        a.   *The 2010-2012 Affiliate Agreements.*

The elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach.  *Baker,* 2014 WL 6805483, at *3 (citing *Egle Grp.,* 490 F.3d at 387).

As a matter of law, Defendants cannot establish that the Affiliate Agreements executed by Defendants prior to the 2014 License Agreements remained subsisting and enforceable agreements after the License Agreements were executed in 2014.  Given that the License Agreement contains integration and written modification clauses, Defendants cannot meet the first element of their breach of contract claim – that the Affiliate Agreement is a subsisting contract following execution of the License Agreement. (Fornaro at ¶65, Exs. 2-D and 2-E at §2(d), 17(d) and 17(f) (App. 110, 156, and 181); Freitas at ¶65, Ex. 1-F at §2(d), 17(d) and 17(f)

(App. 015, 074, 085, and 086); Englebrecht at ¶56, Ex. 3-C at §2(d), 17(d) and 17(f) (App. 216, 255, and 267)).   For this reason, DRN's Motion should be granted as to Defendants' breach of contract claim based on the Affiliate Agreements.

Defendants assert that DRN breached Sections 6.2, 7.4 and 7.5 (and Schedule 1) of Affiliate Agreements they entered into with DRN prior to 2014 by allegedly coercing Defendants into entering into the License Agreements in March 2014.   (Dkt. No. 52 at ¶¶79-92, 137(a) – 137(c)).   Section 17(e) of each of the 2014 License Agreements sets out an integration clause stating:

> This Agreement supersedes all prior agreements, whether written, not oral, between the parties with respect to its subject matter and constitutes (along with any documents delivered pursuant to this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter.[5]

(Fornaro at ¶65, Exs. 2-D and 2-E at §17(e) (App. 110, 168, and 193); Freitas at ¶65, Ex. 1-F at §17(e) (App. 015 and 086); Englebrecht at ¶56, Ex. 3-C at §17(e) (App. 216 and 267)).

The parol evidence rule generally bars enforcement of prior or contemporaneous agreements introduced to vary, add to, or contradict terms of a fully integrated written instrument. *Beijing Metals & Minerals Imp./Exp. Corp. v. Am. Bus. Ctr., Inc.*, 993 F.2d 1178, 1182-83 (5th Cir. 1993).   Written agreements are presumed to be completely integrated. *Jack H. Brown & Co. v. Toys "R" Us, Inc.,* 906 F.2d 169, 173 (5th Cir. 1990) (citing *Hubacek v. Ennis State Bank,* 159 Tex. 166, 317 S.W.2d 30 (1958)).   In *Jack H. Brown Inc.*, the Fifth Circuit stated:

---

[5] A similar integration clause is set out in Section 7.19 of Defendants' Affiliate Agreements filed in the Appendix to Defendants' Counterclaim. *See* Dkt. No. 53 at App. 287 (Accurate), App. 298 (Accurate), App. 311 (Coastline), App. 321 (Coastline), App. 333 (After Hours), App. 344 (Solid).   Section 8 of Defendants' Sales Agreements also sets out an integration clause. *See* App. 276-277 (Accurate), App. 289-290 (Accurate), App. 301-302 (Coastline), App. 325-326 (After Hours).

Both the parol evidence rule and the doctrine of integration exist so that parties may rely on the enforcement of agreements that have been reduced to writing. If it were not for these established principles, even the most carefully considered written documents could be destroyed by "proof" of other agreements not included in the writing.

906 F.2d at 176. Consistent with these fundamental principles, the Affiliate Agreements executed in 2010–2012 and any alleged oral promises regarding those agreements were superseded by the subsequently executed 2014 License Agreements as a matter of law; therefore, DRN's Motion should be granted for this reason.

      b.    *The 2014 License Agreements.*

Defendants also claim that DRN breached the License Agreements by:

1.    failing to make payments as required by Schedule 1 (Dkt. No. 52 at ¶¶73, 137(b));

2.    terminating the License Agreements without providing proper notice and an opportunity to cure in accordance with Section 12 (*Id.* at ¶¶93-97, 137(d)); and

3.    filing and prosecuting this action in violation of alleged oral assurances that Defendants could "continue using their DRN Kits to collect and use ALPR Data if their relationship with DRN were ever to terminate." (*Id.* at ¶137(e)).

Defendants cannot satisfy the elements of their claims for breach of the License Agreements as a matter of law. Alleged breaches contrary to the language of the obligations of the parties as defined in the License Agreements are barred by the integration clauses and the parol evidence rule. (Fornaro at ¶65, Exs. 2-D and 2-E at §17(e) (App. 110, 168 and 193); Freitas at ¶65, Ex. 1-F at §17(e) (App. 015 and 086); Englebrecht at ¶56, Ex. 3-C at §17(e) (App. 216 and 267)). Finally, the initiation of suit by DRN is not barred by any provision of the License Agreements, which the parties agreed in Section 17(f) could not be "amended, supplemented, or otherwise modified except by a written agreement executed by the party to be charged with the amendment." (Fornaro at ¶65, Exs. 2-D and 2-E at §17(e) (App. 110, 168 and

193); Freitas at ¶65, Ex. 1-F at §17(e) (App. 015 and 086); Englebrecht at ¶56, Ex. 3-C at §17(e) (App. 216 and 267)).

2.   The Limitation of Liability Clause Bars Defendants' Breach of Contract Claim.

Limitation of liability clauses are enforceable in Texas. *Fox Elec. Co., Inc. v. Tone Guard Sec., Inc.*, 861 S.W.2d 79, 82 (Tex. App.—Fort Worth 1993, no writ). Under Texas law, "contracting parties can limit their liability in damages to a specified amount," and "it is immaterial whether a limitation of liability is a reasonable estimate of probable damages resulting from a breach." *Global Octanes Texas, L.P. v. BP Exploration & Oil Inc.*, 154 F.3d 518, 521 (5th Cir. 1998) (citing *Vallance & Co. v. Anda*, 595 S.W.2d 587, 590 (Tex. Civ. App.-San Antonio 1980, no writ)); *see also Gulf Liquids New River Project, LLC v. Gulsby Eng'g, Inc.*, 356 S.W.3d 54, 67 (Tex. App.-Houston [1st Dist.] 2011, pet. denied); *Shasteen v. Mid-Continent Refrigerator Co.*, 517 S.W.2d 437 (Tex. Civ. App.-Dallas 1974, writ ref'd n.r.e.) ("Under Texas law, parties to a contract may agree to the remedy to be applied in the event of breach. The remedy will be enforced by the courts so long as it is not illegal or against public policy."). Moreover, contractual limitation of liability provisions have been held to bar non-contract claims. *Thermacor Process, L.P. v. BASF Corp.*, 567 F.3d 736, 743 (5th Cir. 2009) (disclaimer of warranty can bar negligent misrepresentation, fraud, and DTPA claims).

The License Agreement contains a limitation of liability clause. Section 14 of the License Agreements states:

14.   Limitations of Liability.   DRN WILL NOT BE LIABLE TO DRN AFFILIATE FOR ANY LOSS, INJURY, CLAIM, LIABILITY OR DAMAGE OF ANY KIND **RESULTING FROM DRN AFFILIATE'S PARTICIPATION IN THE DRN RECOVERY NETWORK**. DRN WILL NOT BE LIABLE TO DRN AFFILIATE UNDER ANY CONTRACT, NEGLIGENCE, TORT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY FOR ANY SPECIAL, DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES OF ANY KIND WHATSOEVER (INCLUDING, WITHOUT LIMITATION,

LOSS OF REVENUE OR GOODWILL OR ANTICIPATED PROFITS OR LOST BUSINESS) **ARISING FROM OR RELATING TO THIS AGREEMENT**. TO THE EXTENT THE FOREGOING LIMITATION OF LIABILITY IS PROHIBITED OR OTHERWISE UNENFORCEABLE, DRN'S CUMULATIVE LIABILITY TO DRN AFFILIATE ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL NOT EXCEED THE LESSER OF (A) THE TOTAL REVENUE SHARE PAYMENTS (AS PROVIDED IN SCHEDULE 1) ACTUALLY PAID TO DRN AFFILIATE UNDER THIS AGREEMENT OR (B) $10,000.

(Fornaro at ¶65, Exs. 2-D and 2-E at §14 (App. 110, 165 and 190); Freitas at ¶65, Ex. 1-F at §14 (App. 015 and 083); Englebrecht at ¶56, Ex. 3-C at §14 (App. 216 and 264) (emphasis added)).

Given this enforceable limitation of liability clause, as a matter of law, Defendants cannot recover for breach of contract against DRN. The Court should grant summary judgment on DRN's affirmative defense that Defendants' claims are barred by the "contractual limitation of liability set forth in the License Agreement, Section 14." (Dkt. No. 66 at ¶22).

**D.      DRN Is Entitled To Summary Judgment On Its Affirmative Defense of Novation.**

DRN pled the affirmative defense of novation. Novation is the substitution of a new agreement between the same parties or the substitution of a new party on an existing agreement. *Honeycutt v. Billingsley,* 992 S.W.2d 570, 576 (Tex. App.-Houston [1st Dist.] 1999, pet. denied). Where a novation occurs, only the new agreement may be enforced. *Id.* To establish a novation, the party raising the defense must prove: (1) the existence of a previous, valid obligation; (2) a mutual agreement of the parties to a new contract; (3) the extinguishment of the old contract; and (4) the validity of the new contract. *New York Party Shuttle, LLC v. Bilello*, 414 S.W.3d at 214; *RM Crowe Prop., L.P. v. Strategic Energy, L.L.C.,* 348 S.W.3d at 448; *Vickery v. Vickery,* 999 S.W.2d at 356.

"The substitution of a new agreement occurs when a later agreement is so inconsistent with a former agreement that the two cannot subsist together." *Fulcrum Cent. v. AutoTester, Inc.*, 102 S.W.3d 274, 277-78 (Tex. App.—Dallas 2003, no pet.) (citing *Scalise v. McCallum,*

700 S.W.2d 682, 684 (Tex. App.-Dallas 1985, writ ref'd n.r.e.)).  In the absence of inconsistent provisions, "a second contract will operate as a novation of a first contract only when the parties to both contracts intend and agree that the obligations of the second shall be substituted for and operate as a discharge of the obligations of the first." *Id.* (citing *Chastain v. Cooper & Reed,* 257 S.W.2d 422, 424 (Tex. 1953)).  A new agreement can establish a novation as a matter of law when the state of the evidence is such that reasonable minds cannot differ as to its effect. *Savitch v. Sw. Bell Yellow Pages, Inc.*, 2-04-257-CV, 2005 WL 1839092, at *4 (Tex. App.—Fort Worth Aug. 4, 2005, no pet.) (citing *Citi Priesmeyer, Inc. v. K & O,* 164 S.W .3d 675, 681 (Tex.App.-Austin 2005, no pet.)).

Here, it is undisputed that the Defendants and DRN entered into and operated under Affiliate Agreements between 2010 and 2012.  (Freitas at ¶36 (App. 008)).  Defendant After Hours executed an Affiliate Agreement on or about August 2011.  (Englebrecht at ¶17 (App. 205)).  Defendant Coastline executed an Affiliate Agreement on or about July 7, 2010.  (Fornaro at ¶20 (App. 098)).  Defendant Solid executed an Affiliate Agreement on or about April 2013.  (Fornaro at ¶41 (App. 104)).  Defendants also entered into Affiliate Agreements after the original agreements and before the License Agreement. *See* Dkt. No. 53 at App. 287 (Accurate), App. 298 (Accurate), App. 311 (Coastline), App. 321 (Coastline), App. 333 (After Hours), App. 344 (Solid).  Section 8 of Defendants' Sales Agreements also sets out an integration clause. *See* App. 276-277 (Accurate), App. 289-290 (Accurate), App. 301-302 (Coastline), App. 325-326 (After Hours).  It is also undisputed that the parties executed the License Agreements in 2014 and that the License Agreement replaced the Affiliate Agreements.  (Freitas at ¶53 (App. 013), Englebrecht at ¶43 (App. 213-214), Fornaro at ¶52 (App. 107)).  As Defendants admit, the License Agreement replaced "the former Affiliate Agreements they had signed." (*Id.*).

A comparison of the plain language of the Affiliate Agreements with that of the License Agreements makes clear that the License Agreements were intended to substitute for and replace the Affiliate Agreements. Given the language of the agreements and the foregoing admissions by Defendants, DRN is entitled to summary judgment as to its affirmative defense of novation because the 2014 License Agreement substituted the parties' previous contractual relationship in the Affiliate Agreements.

**E.   DRN Is Entitled To Summary Judgment On Its Affirmative Defense of Accord And Satisfaction.**

An "accord" of an accord and satisfaction is a new contract to discharge an existing obligation. *Honeycutt v. Billingsley*, 992 S.W.2d at 576-77; *Jenkins v. Henry C. Beck Co.*, 449 S.W.2d at 455; *Bueckner v. Hamel*, 886 S.W.2d at 372. "Satisfaction" is the performance of the new contract. *City of Houston v. First City*, 827 S.W.2d at 472. In the new contract: (1) the parties agree to discharge the existing obligation; (2) the parties agree that one party will perform and the other will accept something different from what each expected from the existing obligation; (3) the parties unmistakably communicate that the different performance will discharge the existing obligation; (4) the agreement to discharge the existing obligation is plain, definite, certain, clear, full, explicit, and not susceptible of any other interpretation; and (5) the parties' agreement must be accompanied by acts and declarations that the creditor is "bound to understand." *Jenkins v. Henry C. Beck Co*, 449 S.W.2d at 455. The consequence of a finding of accord and satisfaction is a bar to any action on the original obligation. *Richardson v. Allstate Texas Lloyd's*, 235 S.W.3d 863, 865 (Tex. App.—Dallas 2007, no pet.); *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979); *Ensley v. Spickard*, 232 S.W.2d 780 (Tex.Civ.App. Dallas 1950, writ ref'd).

The undisputed facts and Defendants' own admissions support summary judgment for DRN on its affirmative defense of accord and satisfaction.  Here, it is undisputed that (1) the parties agreed that the License Agreement replaces all prior agreements (Freitas at ¶53 (App. 013), Englebrecht at ¶43 (App. 213-214), Fornaro at ¶52 (App. 107)); (2) Defendants agreed to the terms of the License Agreement knowing that their obligations were different than those under the Affiliate Agreements (Freitas at ¶54 (App. 013), Englebrecht at ¶44 (App. 214), Fornaro at ¶53 (App. 107)); (3) DRN communicated that the License Agreement would discharge the obligations of Defendants existing under the Affiliate Agreements (Fornaro at ¶65, Exs. 2-D and 2-E at §17(e) (App. 110, 168 and 193); Freitas at ¶65, Ex. 1-F at §17(e) (App. 015 and 086); Englebrecht at ¶56, Ex. 3-C at §17(e) (App. 216 and 267)); (4) the License Agreement contains an integration clause that is plain, definite, certain, clear, full, explicit, and not susceptible of any other interpretation (*Id.*); and (5) Defendants understood and are charged as a matter of law with knowledge that they were bound by the License Agreement, which they reviewed and modified before executing, specifically pointing out differences between the two agreements.  (Freitas at ¶¶55, 56, 57, 58, and 64, Ex. 1-F (App. 013-015 and 070-094); Fornaro at ¶¶54, 55, 56, 57, and 63, Exs. 2-D and 2-E (App. 107-109 and 152-201); Englebrecht at ¶¶45, 46, 47, 48, and 54, Ex. 3-C (App. 214, 216, and 251-275)).

DRN has satisfied all the elements of the affirmative defense of accord and satisfaction.  Summary judgment should be granted.

## F.    DRN Is Entitled To Summary Judgment On Defendants' DTPA Claim.

### 1.    Legal Standard for Application of Statute of Limitation.

Although Texas law must be consulted to determine the applicable limitations periods, federal law determines when a cause of action accrues.  *Williams v. Upjohn Co.*, 153 F.R.D. at 113; *Slack v. Carpenter*, 7 F.3d at 419; *Gartrell v. Gaylor*, 981 F.2d at 257.  A cause of action

accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred. *TIG Ins. Co. v. Aon Re, Inc.,* 521 F.3d at 355. A cause of action generally accrues, and the statute of limitations begins to run, when facts come into existence that authorize a claimant to seek a judicial remedy. *Id.* The statute of limitations, therefore, begins to run when the plaintiff is in possession of the critical facts that he has been injured. *Bayou Bend Towers Council of Co. Owners v. Manhattan Constr. Co.,* 866 S.W.2d at 742. A party need only be aware of enough facts to apprise him of his right to seek a judicial remedy. *Id.*

2.   The Two-Year Statute Of Limitations Bars Defendants' DTPA Claims.

DTPA claims in Texas are subject to a two-year statute of limitations. *See* TEX. BUS. & COM. Code § 17.565. An action for the violation of the DTPA accrues on either (1) the date when the false, misleading or deceptive act or practice occurred, or (2) the date when the plaintiff discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice. *Id.; Gonzales v. Southwest Olshan Found. Repair Co.,* 400 S.W.3d 52, 57 (Tex. 2013); *KPMG Peat Marwick v. Harrison Cty. Hous. Fin. Corp.,* 988 S.W.2d 746, 749 (Tex. 1999); *Four Bros. Boat Works, Inc. v. Tesoro Pet. Cos.,* 217 S.W.3d 653, 663-64 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). The plaintiff does not need to know the full extent of the injury for limitations to begin to run. *Gonzales v. Southwest Olshan Found. Repair Co.,* 400 S.W.3d at 58; *Murphy v. Campbell,* 964 S.W.2d 265, 273 (Tex. 1997). Determining the accrual date is a matter of law. *Provident Life & Acc. Ins. v. Knott,* 128 S.W.3d 211, 221-22 (Tex. 2003).

Discovery does not necessarily mean "actual knowledge of the particulars of a cause of action." *Vaught v. Showa Denko K.K.,* 107 F.3d 1137, 1141-42 (5th Cir. 1997). Instead, the

question is whether the plaintiff has "knowledge of facts which would cause a reasonable person to diligently make inquiry to determine his or her legal rights." *Id.*

Defendants maintain that DRN violated the DTPA by: (1) "representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;" and (2) "failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed."   TEX. BUS. & COM. CODE §§17.46(b)(12), (24).

Defendants maintain that DRN made the following alleged misrepresentations in <u>2009 and 2010</u> at industry conferences:

- Agents purchase DRN Kits (comprised of cameras, a laptop, and software) and use those kits to capture ALPR Data, which through the DRN software, would be compiled and stored on DRN's website, thereby becoming a DRN "Affiliate." (Freitas at ¶27(a) (App. 005); Fornaro at ¶22(a) (App. 098-099); Englebrecht at ¶18(a) (App. 205-206)).

- Affiliates are independent contractors of DRN and shoulder 100% of the cost of purchasing and operating the DRN Kits (vehicle ownership/maintenance, personnel costs, gasoline, insurance, etc.). (Freitas at ¶27(b) (App. 005); Fornaro at ¶22(b) (App. 099); Englebrecht at ¶18(b) (App. 206)).

- Affiliates enter all of their Assignments into an online recovery database compatible with DRN. When the Affiliate's DRN Kit "hits" upon a vehicle that matches with an Assignment on the Affiliate's Agent List, DRN automatically notifies the Affiliate, who in turn repossesses the vehicle ("Private Assignments"). DRN does not charge any fee to the Agent for this service. (Freitas at ¶27(c) (App. 005-006); Fornaro at ¶22(c) (App. 099); Englebrecht at ¶18(c) (App. 206)).

- Each DRN Affiliate is afforded the unfettered ability to access and use the ALPR Data captured with its own DRN Kits as a tool to complete Private Assignments. For example, if a DRN Affiliate has been collecting ALPR Data for twelve months, it can access the entire year's worth of ALPR Data for the purposes of (i) determining whether, where, and when newly assigned vehicles were previously spotted; or (ii) notifying clients with recently-closed Assignments (meaning, the vehicle was never repossessed but the client has either given up

looking for it or has assigned the repossession to another Agent) that the corresponding vehicles have been located and can now be repossessed. (Freitas at ¶27(d) (App. 006); Fornaro at ¶22(d) (App. 099); Englebrecht at ¶18(d) (App. 206)).

- In addition to using the DRN Kits to help complete Private Assignments, Affiliates would have the opportunity to complete additional Assignments on behalf of forwarders with whom DRN partnered (*i.e.* vehicles on DRN's System List or "DRN Assignments"). However, DRN would not favor DRN Assignments over Private Assignments. If an Affiliate "hit" upon a vehicle that corresponded to both a Private Assignment and a DRN Assignment, the Affiliate would be permitted to repossess the vehicle pursuant to the Private Assignment and would not have to share any of the resulting revenue with DRN. (Freitas at ¶27(e) (App. 006); Fornaro at ¶22(e) (App. 099-100; Englebrecht at ¶18(e) (App. 206-207)).

- Each Affiliate could also earn "DRN Data Revenue" calculated based on (i) each license plate captured by their DRN Kits *regardless* of whether that image was used for or led to a repossession; or (ii) a percentage of revenue DRN earned either by selling the Affiliate's ALPR Data to forwarders or lenders, or through the completion of DRN Assignments with the assistance of the Affiliate's ALPR Data. (Freitas at ¶27(f) (App. 006); Fornaro at ¶22(f) (App. 100); Englebrecht at ¶18(f) (App. 207)).

- DRN would pay each Affiliate its share of DRN Data Revenue on a monthly basis. (Freitas at ¶27(g) (App. 007); Fornaro at ¶22(g) (App. 100); Englebrecht at ¶18(g) (App. 207)).

(*See also* Freitas at ¶27 (App. 005-007); Fornaro at ¶22 (App. 098-100); Englebrecht at ¶18 (App. 205-207)).

Defendants also allege that Plaintiff made other representations in 2009 and 2010.

Defendants allege Plaintiff made the following statements:

- On May 4, 2009, in a solicitation email, Plaintiff's sales manager Gary DeHart stated that DRN "is not a forwarding company" and would not "come between [Affiliates] and [their] clients." DeHart further states that each Affiliate would be able "to monitor its [ALPR System] results '24/7.'" (Freitas at ¶32 (App. 007); Fornaro at ¶27 (App. 100-101); Englebrecht at ¶23 (App. 207-208)).

- In April 2010, Defendants allege that they received an email from Plaintiff that included the following statements:

  - *"DRN is the only LPR company that provides its Affiliates with FREE access to the plates they scan thereby allowing them to compile local databases from*

*which to bounce their new orders against."* (Freitas at ¶33 (App. 007-008); Fornaro at ¶28 (App. 101); Englebrecht at ¶24 (App. 208)).

- DRN is "a data company that offers a valuable tool to all professional repossessors that does not] help one forwarding or skip company increase its own market share over others;" (*Id.* (App. 007-008, 101 and 208)).

- "DRN is the only LPR company that shares its revenue with its Affiliates. All DRN Affiliates™ are sent a check on the 20th of each month." (*Id.* (App. 007-008, 101 and 208)).

Finally, Mr. Fornaro, sole owner of Coastline and Chief Executive Officer of Solid, alleges that he had numerous conversations in the first half of 2010 with Mr. DeHart, who assured him that Coastline would always have unlimited access to the ALPR Data generated from its own DRN Kits and that, if Coastline ever parted ways with DRN, Coastline could continue using its DRN Kits independently in any manner it saw fit. (Fornaro at ¶30 (App. 101)). Coastline allegedly purchased its DRN Kits in 2010 in reliance on these representations. (Fornaro at ¶30 (App. 101)).

Defendants contend that these "representations were false and, on information and belief, DRN either knew these representations to be false when made, or made them without knowledge of whether the statements were true or false." (Dkt. No. 52 at ¶66). The alleged statements that form the basis of Defendants' DTPA claims occurred in 2009 and 2010. Defendants did not file their DTPA claim until April 15, 2015. As a result, their claims are barred by the two-year statute of limitations.

3. Defendants' Cannot Meet The Reliance Or Producing Cause Of Their DTPA Claim.

Defendants' DTPA claim lacks a key element: deception. As previously noted, the parties signed unambiguous agreements (the Affiliate Agreements and License Agreements) that negate any reliance by Defendants. Defendants were aware of the contract terms, which were extensively negotiated. (Dkt No. 52 at ¶91 ("[t]he Companies' principals then collaborated to

review and revise the License Agreement and made several material changes. . . ."); (Fornaro at ¶¶53-57 and 62 (App. 107-109); Englebrecht at ¶¶43-48 and 53 (App. 213-216); Freitas at ¶¶54-58 and 63 (App. 013-015)).   As a result, purported reliance on generalized statements from marketing materials made years prior is unavailing.   The extensive negotiations and agreement to the resulting terms disprove any lack of knowledge, ability, or experience on the part of Defendants, as required to prove an unconscionable act under the DTPA.   *See, e.g.,* §17.45(5) (requiring proof of consumer's lack of knowledge, ability, experience, or capacity to show unconscionable act).   The same facts also refute any reliance, as required to support a DTPA laundry list violation.   *See, e.g.,* Tex. Bus. & Com. Code §17.50(a)(1)(B).   Moreover, the waiver of reliance and integration clauses bar Defendants' efforts to void the contracts at issue based on the alleged misrepresentations.   *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.*, 896 S.W.2d 156, 161 (Tex. 1995) (a "contractual disavowal of reliance upon any representation . . . negates causation essential to recovery" on DTPA claim).

The Affiliate Agreements, License Agreements and certain of the Sales Agreements also contain disclaimer of warranty provisions.   *See* Dkt. No. 53 at APP 287 (Accurate), APP 298 (Accurate), APP 311 (Coastline), APP 321 (Coastline), APP 333 (After Hours), APP 344 (Solid). Section 8 of Defendants' Sales Agreements also sets out an integration clause.   *See* APP 276-277 (Accurate), APP 289-290 (Accurate), APP 301-302 (Coastline), APP 325-326 (After Hours).   A disclaimer of warranty can bar DTPA claims.   *Thermacor Process, L.P. v. BASF Corp.*, 567 F.3d 736, 743 (5th Cir. 2009).   To prevail on a DTPA claim, a consumer must establish that the defendant "violated a specific provision of the Act, and that the violation was a ***producing cause*** of the claimant's injury."   *Roy v. JPMorgan Chase Bank, N.A.*, No. 12-CV-2657, 2013 WL 164147, at *3 (S.D. Tex. Jan. 15, 2013) (emphasis added); Tex. Bus. & Com. Code §17.50(a);

*Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex. 1995). In light of the relevant contract language, Plaintiff's Motion should be granted as to Defendants DTPA claims.

**G.    DRN Is Entitled To Summary Judgment On Defendants' Liability For Breach of Contract.**

DRN asserts breach of contract claims against Defendants for breaching certain obligations under the License Agreement. The elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Baker v. Great N. Energy, Inc.*, 2014 WL 6805483, at *3. The undisputed facts establish as a matter of law that Defendants breached their respective License Agreements by (a) using the Sync Tool to make and retain copies of the LPR Data on Defendants' server while the License Agreements were in effect, and (b) continuing to use the DRN Car Detector software without a license to collect LPR Data after the License Agreements were terminated. Accordingly, while DRN intends to present evidence of additional breaches of the License Agreements at trial, as well as evidence relating to damages and attorneys' fees, DRN moves for partial summary judgment at this time as to Defendants' liability based on the foregoing breaches.

1.    <u>Use of the Sync Tool to Make and Retain Copies of the LPR Data</u>

It is undisputed that the parties entered into the License Agreements and that DRN performed under the License Agreements by, among other things, providing Defendants access to the DRN System. Section 2(c) of each License Agreement expressly provided that DRN retained all title and right to the LPR Data collected by Defendants, and that Defendants did not have any ownership interest in or to the LPR Data they collected. Section 2(d) of each License Agreement prohibited Defendants from making, retaining, and distributing copies of the LPR

Data.   Additionally, LPR Data is expressly included within the definition of "Confidential Information" in the License Agreements, and under Section 11(c)(3) of each License Agreement Defendants expressly agreed not to copy or reproduce any portion of the Confidential Information or to use or otherwise exploit the Confidential Information in any way.

The undisputed evidence, including Defendants' sworn statements in this case, show that Defendants breached their License Agreements by using the Sync Tool to make and retain copies of the LPR Data collected by Defendants and place that LPR Data on Defendants' local server. (Englebrecht at ¶36 (App. 212); Fornaro at ¶45 (App. 105-106); Freitas at ¶45 (App. 011). While, unbeknownst to DRN, Defendants began using the Sync Tool in 2012 to copy and retain LPR Data, it is the use of the Sync Tool after the License Agreements were executed in March 2014 and before they were terminated in September 2014 that constitutes a breach of the License Agreements.

The undisputed evidence also demonstrates that Defendants were sharing the LPR Data they each collected while the License Agreements were in effect with each other and with at least one other DRN Affiliate, Four Star Recovery, Inc.  (Freitas at ¶48 (App. 012); Fornaro at ¶47 (App. 106); Englebrecht at ¶38 (App. 212); Chapman at ¶¶5, 7 (App. 512); Barker at ¶¶10-11 (App. 500).  The License Agreements also prohibits Defendants from distributing LPR Data to third parties (App. 458), and each Defendant is a "third party" under the License Agreements to which it is not a party.

Defendants' admitted use of the Sync Tool to make, retain and distribute LPR Data amongst themselves and Four Star is a clear breach of the License Agreements, and DRN is entitled to summary judgment as a matter of law.

2.     Use of the DRN Car Detector Software after termination of the License
       Agreements.

Defendants further breached the License Agreements by continuing to use the DRN Car

Detector software after the License Agreements were terminated to collect LPR Data.   In that

regard, Section 12 of each License Agreement expressly states:

> Upon termination or expiration of this Agreement for any reason the
> Licensed Access and all other licensed rights granted in this Agreement
> will immediately cease to exist and DRN Affiliate shall promptly
> discontinue all use of the DRN System, erase all copies of the DRN Car
> Detector software from DRN Affiliate's or any Related Party's computers,
> and return all copies of any such software and related documentation.

Moreover, the definition of "Confidential Information" in the License Agreements

expressly includes all computer software and programs and "the DRN System," and the DRN

Car Detector software is part of the DRN System as defined in the License Agreements.   (App.

070).   Section 11(c)(5) of each License Agreement expressly provides:

> **Return of Confidential Information.**   Upon termination or expiration of
> this Agreement, or upon DRN's earlier request, DRN Affiliate shall
> promptly destroy all Confidential Information, any copies or partial copies
> thereof and material containing such Confidential Information and certify
> to DRN in writing that it has done so.   (App. 081).

Defendants not only failed to erase, destroy or return all copies of the DRN Car Detector

software, they acknowledge in their sworn statements that they are continuing to use DRN's

software to collect LPR Data for their own purposes.   (Fornaro at ¶75 (App. 111-112); Freitas at

¶71 (App. 016-117); Englebrecht at ¶62 (App. 217-218)).   Accordingly, DRN is entitled to

summary judgment as a matter of law.

This admitted use is a breach of the License Agreement which entitles DRN to summary

judgment on its breach of contract claim against Defendants.   Discovery is ongoing, and DRN

intends to demonstrate additional contractual breaches by Defendants at trial.   However, the facts

currently known and available to DRN establish breach of the License Agreements as a matter of law as set forth above.

**H.    DRN Is Entitled To Its Attorneys' Fees And Expenses Under the DTPA.**

DRN is entitled to its attorneys' fees pursuant to the DTPA.   A party can recover reasonable attorneys' fees and costs necessary to defend a DTPA claim if the court finds that the suit was groundless in fact or law, brought in bad faith, or brought for the purpose of harassment. TEX. BUS. & COM. CODE §17.50(c); *Lopez v. RS Clark & Assocs.,* 396 S.W.3d 656, 657 (Tex. App.—Dallas 2013, no pet.); *Loeffler v. Lytle ISD,* 211 S.W.3d 331, 350 (Tex. App.—San Antonio 2006, pet. denied); *Barkhausen v. Craycom, Inc.,* 178 S.W.3d 413, 422 (Tex. App.— Houston [1st Dist.] 2005, pet. denied); *Transport Indem. Co. v. Orgain, Bell & Tucker,* 846 S.W.2d 878, 882 (Tex. App.—Beaumont 1993, writ denied).   A party seeking attorneys' fees need not segregate fees incurred in connection with claims that are so interrelated that their "prosecution or defense entails proof or denial of essentially the same facts." *Flint & Assoc. v. Pipe & Steel, Inc.,* 739 S.W.2d 622, 624-25 (Tex.App.—Dallas 1987, writ denied).   To recover attorneys' fees, a party must show the attorneys' fees and costs are reasonable and necessary. *See* TEX. BUS. & COM. CODE §17.50(c).

DRN is entitled to recover its reasonable and necessary attorneys' fees and expenses incurred in this lawsuit in defending against Defendants' DTPA claim.   Those fees are reasonable and necessary because Defendants' DTPA claim was groundless in fact or law and brought in bad faith or brought for the purposes of harassment given that Defendants' DTPA claim is barred by the two-year DTPA statute of limitations.   Because their DTPA claim was barred in 2011 and 2012 under any interpretation of the operative facts, Defendants' DTPA claim brought either three (3) or four (4) years after expiration of the statute of limitations expired was clearly groundless.   Additionally, this Court cautioned Defendants that it was

"unlikely" Defendants could prevail on the DTPA claim. (Dkt. No. 65 at p. 11). Despite that warning, Defendants continued pursuing their DTPA claim. Therefore, DRN should be awarded its reasonable and necessary attorneys' fees and expenses from Defendants.

As a result, DRN asks that the Court exercise its discretion and award Plaintiff its reasonable and necessary attorneys' fees and expenses. *See* TEX. BUS. & COM. CODE §17.50(C). Upon such a finding, DRN requests the opportunity to submit proof of its reasonable fees and expenses via affidavit to the Court.

## IV.   CONCLUSION AND PRAYER

Plaintiff Digital Recognition Network, Inc. respectfully prays that this Court enter an Order granting summary judgment in its favor (1) as to all counterclaims brought by Defendants and (2) on its breach of contract claim against Defendants, and (3) awarding DRN attorneys' fees and expenses against Defendants in an amount to be determined via affidavit submission to the Court. DRN requests all such other relief to which it is justly entitled.

Respectfully submitted,

By: _____

**Cole B. Ramey**
State Bar No. 16494980
**W. Alan Wright**
State Bar No. 22062700

**KILPATRICK TOWNSEND & STOCKTON LLP**
2001 Ross Avenue, Suite 4400
Dallas, Texas  75201
Telephone:  (214) 922-7100
Facsimile:  (214) 922-7101
E-mail:     cramey@kilpatricktownsend.com
            alan.wright@kilpatricktownsend.com

- and -

Douglas R. Hudman
State Bar No. 10149860
Matthew R. Hudman
State Bar No. 24041143
**HOLLAND, JOHNS & PENNY, LLP**
306 W. 7th Street, Suite 500
Ft. Worth, Texas  76102
Telephone:  (817) 335-1050
Facsimile:  (817) 332-3140
E-mail:     drh@hjpllp.com

**ATTORNEYS FOR PLAINTIFF
DIGITAL RECOGNITION NETWORK, INC.**

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 20th day of January, 2016, a true and correct copy of the foregoing document was forwarded to the following counsel of record via certified mail, return receipt requested, and PDF/e-mail.

Peter M. Spingola
Sara Siegall
CHAPMAN SPINGOLA, LLP
190 South LaSalle Street, Ste. 3850
Chicago, Illinois 60603
pspingola@chapmanspingola.com
ssiegall@chapmanspingola.com

Gina Viccinelli
HERMES LAW, P.C.
2001 N. Lamar Street, Suite 450
Dallas, Texas 75202
Gina@Hermes-Law.com

W. Alan Wright